CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

2005 JUL -1  AH 10: 30

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CHRISTINE O'DONNELL )
)
    Plaintiff, )
)
v. )
)    Civil Action No.   0 5 -  4 5 7
)    _ _ _ _ _ _ _ _ _ _ _
INTERCOLLEGIATE STUDIES )
INSTITUTE, Inc. )
3901 Centerville Road )
Wilmington, Delaware 19807 )
Serve:  T. Kenneth Cribb, Jr, President )    **TRIAL BY JURY DEMANDED**
)
    Defendant. )
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ )

## COMPLAINT

The Plaintiff, CHRISTINE O'DONNELL, sues the Defendant, INTERCOLLEGIATE

STUDIES INSTITUTE, Inc., and hereby states and alleges that this action is brought to remedy

intentional discrimination and/or discriminatory disparate impact on the basis of gender, in

violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000, *et. seq.*; the

Equal Pay Act, corresponding laws and rights under Delaware State law, and defamation,

fraudulent inducement of contract, brought under the pendent jurisdiction of the Court, arising

from a common nucleus of operative facts brought under the pendent jurisdiction of the Court.


## I. JURISDICTION AND VENUE

**1)** The jurisdiction of this Court is invoked pursuant to Section 706 (f) (3) of the Civil

Rights Act of 1964, amended by the Civil Rights Act of 1991, codified at 42 U.S.C. § 2000e,

*et. seq.*, and pursuant to 42 U.S.C. §1891A;  the Civil Rights Act of 1991; Pub L. No. 102-166,

105 Sta. 1071; and 28 U.S.C. §§ 1331, 1337, 1343, 2201 and 2202, conferring original

jurisdiction upon this court of any civil action arising under the laws of the United States and for declaratory and injunctive relief under the Declaratory Judgment Act.

**2)**  The amount in controversy exceeds $75,000.

**3)**  Plaintiff also brings under pendent jurisdiction claims arising under Delaware State Law from a common nucleus of operative facts.  Pendent jurisdiction of these State law claims is proper under 28 U.S.C. §§ 1331, 1332, and 1337 and the pendent jurisdiction doctrine. F.R.Civ. P. 18(a).  United Mine Workers v. Gibbs, 383 U.S. 715 (1966)

**4)**  Venue properly lies in the District of Delaware pursuant to 28 U.S.C. §1391(b) and §1391(e), and 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices were committed in this judicial district within the State of Delaware.

**5)**  The Plaintiff has fulfilled all conditions precedent to the institution of this action including those required pursuant to 42 U.S.C. § 2000(e)-16(c), by filing filed a timely complaint with the Equal Employment Opportunity Commission ("EEOC").

**6)**  Subsequently, the EEOC mailed a notice of the Plaintiff's right to sue in this Court on April 5, 2005, which was received at the Plaintiff's home April 7, 2005, authorizing the Plaintiff to file suit within 90 days of receipt of said notice, by July 6, 2005.

**7)**  Following a May 12, 2004, hearing challenging Miss O'Donnell's right to unemployment compensation, ISI's explanations of her termination were fully and thoroughly aired, and *rejected* by the referee as not credible, and the referee found that Miss O'Donnell had been fired in retaliation for pursuing her rights against workplace discrimination.

## II.  THE PARTIES

**8)**  The Intercollegiate Studies Institute, Inc. is an employer in the State of Delaware who recruited, hired, discriminated against, and fired the Plaintiff.

**9)** The Intercollegiate Studies Institute, Inc. (hereafter "ISI") is a corporation authorized to do business in the State of Delaware which is doing business in the State of Delaware.

**10)** ISI conducts its activities and sells books and materials in commerce nationwide.

**11)** ISI maintains primary offices at 3901 Centerville Road, Wilmington, Delaware 19807

**12)** Christine O'Donnell is a woman and a natural person residing in the State of Delaware.

**13)** Christine O'Donnell was employed by ISI as Director of Communications and Public Affairs of ISI and was employed by ISI from March 12, 2003 through February 26, 2004.

### III.  FACTS COMMON TO ALL COUNTS

#### A.    Identity of Named Individuals

**14)** The Intercollegiate Studies Institute ("ISI") is a public policy organization dedicated to limited government which studies issues of public policy and disseminates information on such topics, technically an educational foundation, and referred to colloquially as a "think tank."

**15)** Among the issues which ISI studies and comments upon are legal issues, including *employment laws and employment policies*, so that ISI is fully aware of and highly-knowledgeable about federal laws against gender discrimination in the workplace, yet ISI is also strongly motivated by ISI's political beliefs to oppose, dislike, and try to evade those laws.

**16)** Christine O'Donnell is a public relations and marketing professional with 15 years experience, including major public relations projects on the national stage, and with very significant contacts and relations with national news media at the time of her recruitment by ISI (such relationships now harmed by the discriminatory and defamatory acts of ISI).

**17)** Miss O'Donnell resided in Washington, D.C. at the time of her recruitment by ISI.

**18)** At the request of ISI, Christine O'Donnell relocated to Delaware for the purpose of entering into such employment with ISI proposed by ISI, and for that reason alone purchased a

mortgaged home at 518 North Lincoln Street, Wilmington, Delaware 19805.

**19)** By the time Miss O'Donnell discovered that ISI had drastically altered the terms of her employment, breaching the agreement as promised, Miss O'Donnell had purchased a home in Wilmington, Delaware, financed by a mortgage, and was encumbered and restricted from changing plans by her obligation to continue making mortgage payments.

**20)** As a result, Miss O'Donnell detrimentally relied upon ISI's false promises concerning her employment, and placed herself in what became a position of financial vulnerability, insecurity, and lack of freedom to object or complain without facing foreclosure on the home.

**21)** T. Kenneth Cribb, Jr. is and was at all times relevant herein President of ISI, and is also an agent of ISI who exercised control over aspects of Plaintiff's compensation, terms, conditions, and privileges of employment at ISI.

**22)** Jeff Nelson is and was at all times relevant herein Vice President of Publishing of ISI, and is also an agent of ISI who exercised control over aspects of Plaintiff's compensation, terms, conditions, and privileges of employment at ISI.

**23)** Eileen Duke is or was at all times relevant herein Jeff Nelson's assistant.

**24)** Elaine Pinder is or was at all times relevant herein Accounting Manager, but represented herself to the Plaintiff as ISI's human resources representative in February 2004.

**25)** Rear Admiral P. Michael Ratliff is or was at all times relevant herein Vice President of Programs for ISI.

**26)** John Lulves is or was at all times relevant herein Executive Vice President of ISI, who despite being outside of Miss O'Donnell's direct chain of command, due to overlapping responsibilities is also an agent of ISI who exercised control over aspects of Plaintiff's compensation, terms, conditions, and privileges of employment at ISI.

**27)** H. Spencer Masloff, Jr. is or was at all times relevant herein Vice President for Development and Fundraising of ISI, who due to overlapping responsibilities is also an agent of ISI who exercised control over aspects of Plaintiff's compensation, terms, conditions, and privileges of employment at ISI.

**28)** Doug Schneider is a recent college graduate who was hired by ISI as ISI's receptionist and clerical assistant straight out college without any professional experience between college and beginning his work at ISI, and is also an agent of ISI who exercised control over aspects of Plaintiff's compensation, terms, conditions, and privileges of employment at ISI.

**29)** ISI has and during all times relevant herein had considerably more than 15 employees.

### B.    Retaliatory Termination

**30)**  ISI terminated Christine O'Donnell in unlawful retaliation because Miss O'Donnell complained to the Equal Employment Opportunity Commission of the United States Government (hereafter "EEOC"), sought information and advice about her legal rights with regard to illegal gender discrimination against her by ISI, and followed the EEOC's advice to request a revised position description prior to accepting new directions from a new supervisor, whose directions were in conflict with the previous directions of Vice President Jeff Nelson.

**31)** Earlier on February 6, 2004, as set forth below, ISI unlawfully and illegally discriminated against Christine O'Donnell because she is a woman by demoting her from her position as Director of Communications and Public Affairs with 15 years experience in public relations and communications in favor of a man with practically no experience, Doug Schneider, and ordered Miss O'Donnell to report to a man, Doug Schneider, as his subordinate.

**32)** Doug Schneider had been hired by ISI straight out of college as ISI's receptionist and clerical assistant, and later handled sales and shipment of books, but was then placed over a

highly-experienced Miss O'Donnell as Mr. Schneider's subordinate in early February 2004.

**33)** ISI was aware that ISI's conduct was unlawful gender discrimination against a woman, including because on February 20, 2004, Miss O'Donnell advised ISI senior executives that ISI's conduct was illegal under Federal and Delaware law while requesting clarification and correction. A copy is attached.

**34)** At no time did ISI ever respond to the concerns raised in that February 20, 2004, letter.

**35)** Also, between February 12 and February 19, 2004, Miss O'Donnell advised Mr. Schneider – ostensibly her new supervisor – that she had consulted with the EEOC and also discussed with Mr. Nelson and Mr. Schneider the Federal laws and requirements explained to her by the EEOC, particularly her right to receive a new, revised position description prior to starting to perform any new duties and prior to taking directions from a different supervisor.

**36)** Between February 12 and February 19, 2004, Miss O'Donnell asked both Mr. Nelson and Mr. Schneider for a new, revised position description as recommended by the EEOC.

**37)** Between February 12 and February 19, 2004, Miss O'Donnell protested to Mr. Nelson her demotion in all but name to be placed subordinate under an inexperienced man.

**38)** In protesting her demotion, Miss O'Donnell had a reasonable belief that ISI's employment actions were illegal, having sought both legal advice and advice from the EEOC.

**39)** On February 25, 2004, at 4:37 PM, ISI Vice President Jeff Nelson sent Miss O'Donnell by email and hard copy a memorandum (forwarded through Mr. Schneider) clearly revealing and demonstrating ISI's ***intent to continue employing her*** at ISI for the indefinite future, in the context of inaccurately discussing Miss O'Donnell's request for time off. A copy of the Memorandum is attached, and ISI's email is contained within Miss O'Donnell's reply.

**40)** A certain trip to Jordan is ***only*** relevant to the extent that written discussions clearly

confirm ISI's **_intention_** to **_continue employing_** Miss O'Donnell long after March 15 2004, thus

proving that ISI's decision to terminate her on February 25, 2004, developed only _because_ ISI

learned only on that same day that Miss O'Donnell had complained to the EEOC.

**41)** This professional trip to Jordan along with various journalists was to begin on March 1,

2004, with Miss O'Donnell **_returning on March 15, 2004_**.

**42)** Thus, ISI's approval on February 25, 2004, of Miss O'Donnell's use of vacation time

starting on March 1, 2004, with Miss O'Donnell **_to return on March 15, 2004_**, clearly shows

ISI's intention **_to continue employing_** Miss O'Donnell **_well beyond March 15, 2004._**

**43)** Similarly, in November, 2003, Miss O'Donnell approached Vice President Jeff Nelson

about a job offer for her to go to work full-time for ICON Productions to promote The Passion

of the Christ, and she expressed her concern and dissatisfaction that ISI had deceived her about

the nature of the job she was hired to perform and the repeated promises of an administrative

staff supervised directly by Miss O'Donnell – promises that were continually broken.

**44)** At that meeting, Mr. Nelson strongly encouraged Miss O'Donnell _not_ to leave ISI and

stated that she was doing a great job and was needed at ISI and that ISI wanted her to remain.

**45)** Mr. Nelson argued that it would be a mistake for Miss O'Donnell to leave ISI and work

for ICON Productions for **"only"** 6 months, rather than to keep a **_"permanent"_** job at ISI.

**46)** Thus, Mr. Nelson indicated ISI's intentions to continue employing Miss O'Donnell far

beyond the 6 months that Mr. Nelson thought the ICON project might last – that is, well

beyond April 2004, and in fact impliedly promised that she would be employed **_permanently_** at

ISI based on his strong satisfaction with the quality of her work at ISI.

**47)** Thereupon, on February 25, 2004, at 4:56 PM Miss O'Donnell responded to ISI senior

executives by email, respectfully clarifying factual inaccuracies in ISI's 4:37 PM February 25,

2004, memorandum but also clarifying that Miss O'Donnell had been discussing her legal rights with the EEOC concerning ISI's unlawful discrimination in demoting Miss O'Donnell from her position as Director of Communications and Public Affairs of ISI. A copy is attached.

**48)** Then, in response to Miss O'Donnell's email, at approximately 5:20 PM on February 25, 2004, ISI's Vice President Jeff Nelson caused his assistant Eileen Duke to telephone Christine O'Donnell to inform Miss O'Donnell that Miss O'Donnell was required to report first thing in the morning to the office of Vice President Jeff Nelson for a meeting with Mr. Nelson.

**49)** Miss O'Donnell reported as ordered at 9:30 AM to Mr. Nelson's office.

**50)** At that meeting at 9:30 AM on the morning of February 26, 2004, Mr. Nelson informed Miss O'Donnell that she was **fired**.

**51)** No reason was given by anyone for ISI to fire Miss O'Donnell, except vaguely that the professional relationship was not working out.

**52)** In fact, no reason was given until five (5) weeks after February 26, 2004.

**53)** Several ISI officials were present at that meeting early at 9:30 on the morning of February 26, 2004, indicating that the decision to fire Miss O'Donnell had been made the day before on February 25, 2004, with arrangements for their presence having already been made.

**54)** At that morning meeting on February 26, 2004, and shortly after, Miss O'Donnell was instantly advised of exit procedures, further indicating that the decision to fire her had already been made the day before on February 25, 2004, after her 4:56 PM email telling ISI that Miss O'Donnell was talking to the EEOC about discrimination.

**55)** Thus, sometime between 4:56 PM and 5:20 PM on February 25, 2004, ISI dramatically reversed its position from that expressed a few minutes earlier in its 4:37 PM memorandum and in other communications and decided to fire Christine O'Donnell, less than 30 minutes after

learning that Christine O'Donnell had sought information and advice from the EEOC about her legal rights upon having been demoted and ordered to report under a less-qualified man.

**56)** As a result of being demoted from her position as Director of Communications and Public Affairs, Miss O'Donnell consulted legal counsel on or about February 9, 2004.

**57)** Thereupon, Miss O'Donnell consulted the Philadelphia, Pennsylvania, office of the EEOC on or about February 12, 2004.  See copy of envelope, attached hereto.

**58)** On the advice of the EEOC, on or about February 12, 2004, Miss O'Donnell requested that ISI provide her with a current job description subsequent to being demoted or reassigned.

**59)** However, ISI refused to provide her with a job description upon request.

**60)** This became a great concern to Miss O'Donnell, because Mr. Nelson had instructed Miss O'Donnell to concentrate on contacting and working with high-level professional work with journalists, and had given confusing and ambiguous explanations for the change.

**61)** However, in conflict with Mr. Nelson's directions, Mr. Schneider believed that Miss O'Donnell was now to be his secretarial, clerical, and administrative subordinate, and Mr. Nelson then ordered Miss O'Donnell to perform clerical, secretarial, and administrative duties for Mr. Schneider, rather than perform the duties that Mr. Nelson had instructed her to perform.

**62)** Miss O'Donnell was and is ***profoundly humiliated*** by this demotion of being asked to perform clerical and administrative tasks, after appearing on national television as a media and public relations expert and spokeswoman, for a man who was hired straight out of college as ISI's receptionist and clerical assistant, and whom she had been asked to *train* previously.

**63)** Therefore, on February 20, 2004, Christine O'Donnell sent a letter to ISI's senior executives, attached, addressing ISI's discriminatory actions in demoting her as a highly-qualified woman in favor of an unqualified man, Doug Schneider, who had been hired straight

out of college as ISI's receptionist and clerical assistant.

**64)** Evidently, based on retroactive statements more than five (5) weeks after her firing, ISI is now claiming that Miss O'Donnell following the advice of the EEOC by asking to have a new and revised position description *was a reason for ISI beginning to consider firing her – that is, ISI effectively **admits to retaliatory discharge.***

**65)** ISI then fired Miss O'Donnell in retaliation for seeking her legal rights under Federal and Delaware law by filing a complaint to the EEOC, having previously expressed repeatedly ISI's intention to continue employing Miss O'Donnell beyond March 2004, until the moment when ISI discovered that Miss O'Donnell had begun a serious complaint with the EEOC (rather than only about vacation) and sought information about her legal rights from being demoted.

### C.   Miss O'Donnell's Qualifications, Circumstances of Hiring, and Claims of Fraudulent Inducement, and Breach of Covenant of Good Faith and Fair Dealing

**66)** Miss O'Donnell was hired by ISI on March 12, 2003.

**67)** ISI Vice President Jeff Nelson was the executive to whom Christine O'Donnell, Director of Communications and Public Affairs, officially reported.

**68)** In February 2003, Mr. Nelson telephoned Miss O'Donnell at her home in Washington, D.C. to explore whether she would be interested in *a new position* that ISI was creating.

**69)** When ISI approached Miss O'Donnell, Miss O'Donnell had already applied to Princeton University's Fall 2003 semester to work towards a Master's degree, making the job at ISI seem impractical and unworkable for her.

**70)** As a result, Miss O'Donnell was highly skeptical at first and believed that the ISI position would not fit with her plans.

**71)** During Miss O'Donnell's interviewing and negotiation for the position, Mr. Nelson and Miss O'Donnell discussed numerous proposed job descriptions and discussed and

negotiated Miss O'Donnell's possible duties and position with the organization.

72) ISI proposed to hire a Director of Communications, but Miss O'Donnell proposed

changing the title to Director of Communications and Public Affairs, which was agreed.

73) During these negotiations, ISI promised that Miss O'Donnell's position would be a

supervisor leading a staff of ten (10) employees subordinate to Miss O'Donnell, in keeping

with Miss O'Donnell's previous supervisory experience and past positions.

74) Despite being skeptical, Miss O'Donnell proposed a salary of $85,000 and was

ultimately persuaded to accept $65,000 only because she was allowed to continue and pursue

her other, independent, profit-making activities such as appearances on national television,

public relations clients on the side, and the like.

75) ISI by Jeff Nelson then responded to Miss O'Donnell's concerns about attending

Princeton by promising that Miss O'Donnell could take some or all of one day a week to attend

classes at Princeton University, and encouraged Miss O'Donnell to do so.

76) Mr. Nelson enthusiastically encouraged Miss O'Donnell to pursue her Master's degree

at Princeton, and insisted that this was not an objection to preclude her from accepting a job

with ISI, because ISI would allow Miss O'Donnell the freedom and time to take those classes.

77) As a part of that agreement, ISI promised to provide Miss O'Donnell with an

administrative and professional staff, which would allow her to have time to pursue her Masters

classes and to pursue other projects at the same time, justifying a salary as low as $65,000.

78) In negotiation with Executive Vice President John Lulves and Vice President Jeff

Nelson, Miss O'Donnell explicitly discussed her other pursuits, and as a condition of her

employment, Miss O'Donnell was explicitly permitted to pursue other projects, clients, and for-

profit activities alongside her employment at ISI, and was explicitly promised that she would

*not* have clerical duties and would have clerical staff and support to perform such tasks for her.

**79)** Very shortly thereafter, Miss O'Donnell was contacted with a proposal to work for another organization in Washington, D.C. for $125,000 on a standard, full-time, salary basis, without the time and freedom to attend Princeton and pursue other business projects.

**80)** Thus, ISI paid Miss ODonnell only $65,000 per year – or $60,000, *less* per year than what Miss O'Donnell was worth – *because* it was a condition of her employment that she be permitted to continue to pursue appearances on national news shows on topics unrelated to ISI, such as appearances on MSNBC and Fox News (which dictate the topic of the day and would never limit such appearances to only ISI topics), and such programs as "Politically Incorrect with Bill Maher," where Miss O'Donnell had been a very-frequent guest on many divergent topics, that she have time to attend classes at Princeton, and maintain additional public relations clients as a for-profit business on the side.

**81)** Thus, a mere $65,000 per year at ISI compared with other job offers at twice the salary was not intended by either ISI or Miss O'Donnell to pay for a full-time, exclusive, or all-consuming job position.

**82)** However, upon beginning work at ISI after relocating from Washington, D.C., to Delaware, Miss O'Donnell soon discovered that ISI had fraudulently induced her employment at ISI by (a) falsely promising a staff working under her, when in fact she was not given any staff, and (b) by falsely promising her time in her work schedule to attend classes at Princeton University, and (c) falsely promising her time and freedom to pursue paid appearances on national television news programs and (d) falsely promising her time and freedom to pursue public relations and marketing clients, for profit, alongside her employment at ISI.

**83)** In effect, ISI fraudulently and unjustly sought to obtain more than they paid for, by

paying $65,000 per year for a $125,000 per year public relations expert on a "24/7" basis.

**84)** ISI violated its promise to allow Miss O'Donnell time to take Master's degree classes at Princeton in return for a salary as small as $65,000 for her credentials and expertise, and as a result of ISI's breach of its agreement, Miss O'Donnell was forced to quit her courses at Princeton, losing her time and money invested in this course of study at Princeton.

**85)** ISI violated its promise to allow Miss O'Donnell time to pursue appearances on national television as a commentator and private clients for profit in return for a salary as small as $65,000 for her credentials and expertise, and as a result of ISI's breach of its agreement, Miss O'Donnell was restricted in appearing on national television and pursing other clients.

### D.   Unlawful Gender Discrimination in Demotion and Constructive Discharge

**86)** The final position description that was agreed upon is the version attached hereto.

**87)** The job description under which Miss O'Donnell was hired and employed required that:

> **Candidates should posses at least five years of communications and development experience, as well as demonstrable writing skills.**

**88)** On February 6, 2004, Doug Schneider did not qualify under the terms of the established position description for Director of Public Affairs to hold that position because he did not have **five (5) years** of communications and development experience.

**89)** Doug Schneider had started with ISI as ISI's receptionist and clerical assistant straight out of college with no experience in public relations or marketing, except perhaps in selling Amway products, and no professional experience after college prior to beginning work at ISI.

**90)** By contrast, Miss O'Donnell had 15 years of outstanding experience, including a very large number of live appearances on national television presenting a public relations message.

91) Even though Mr. Schneider did not qualify to hold Miss O'Donnell's position under the clear terms of the position description, on February 6, 2004, Miss O'Donnell was made subordinate to Mr. Schneider and Mr. Schneider was made Miss O'Donnell's supervisor.

92) In an email dated February 6, 2004, Jeff Nelson wrote:

> **I am putting all Marketing, Sales, and PR/Communications efforts under Doug Schneider's direct supervision effective immediately.**
>
> **This means that you will report to and work with Doug to advance ISI's PR needs.**

93) None of those had previously been within Mr. Schneider's responsibilities.

94) Thus, despite Christine O'Donnell's position of "Director of Communications and Public Affairs," ISI's Vice President clearly demoted Miss O'Donnell to "***report to***" Mr. Schneider "***to advance ISI's PR needs.***" *(emphases added)* thereby transferring all ISI's PR (public relations) activities under Doug Schneider, rather than under the former Director of Communications and Public Affairs Christine O'Donnell.

95) Organizationally, this meant that Miss O'Donnell had previously reported *directly to a Vice President*, Jeff Nelson, but now was ordered to report to an intermediate Director, clearly *demoting* Miss O'Donnell in the organizational structure from *reporting to a Vice President* to a lower level *reporting to a lower-level Director*.

96) ISI took away actual authority and responsibility for ISI's public relations from its then Director of Communications and Public Affairs, Miss O'Donnell, and transferred all of that authority and responsibility to Mr. Schneider, as an unqualified man including by ordering "**This means that you will report to and work with Doug to advance ISI's PR needs**."

97) *As a result, Miss O'Donnell was demoted from having full responsibility for ISI's public relations programs and activities, to reporting under a man now with that authority.*

**98)** Yet in Miss O'Donnell's first week of employment with ISI, Jeff Nelson had instructed Miss O'Donnell to mentor and train Doug Schneider so as to teach him public relations, because Mr. Schneider was inexperienced in public relations and marketing.

**99)** Mr. Schneider was then working to stimulate and fill orders for ISI's books.

**100)** Miss O'Donnell continued training Mr. Schneider as an inexperienced employee.

**101)** But less than one year after asking Miss O'Donnell to mentor and train Mr. Schneider, ISI ordered her *to report to* Mr. Schneider as Mr. Schneider's *subordinate*.

**102)** Thereupon, Mr. Schneider began to treat Miss O'Donnell, including in his work orders and instructions as to her tasks, as a secretarial and clerical assistant and subordinate, despite Miss O'Donnell having more than a decade of superior expertise and experience.

**103)** As a result, Miss O'Donnell suffered profound humiliation, embarrassment, emotional pain, suffering, mental anguish, loss of enjoyment of life, and depression.

**104)** During this period, having profoundly humiliated Miss O'Donnell and causing her mental anguish and pain, ISI later sought to claim that her resulting distress was a reason for having terminated her (although this was never communicated until months later).

**105)** However, the reason that ISI demoted Miss O'Donnell and ordered her to report to a man, Doug Schneider, was because ISI did not want to allow a woman to remain unsupervised by a man and report directly to ISI's President.

**106)** ISI demoted Miss O'Donnell because of a three-month sabbatical by Vice President Jeff Nelson, starting in early February 2004, during which Christine O'Donnell would have been a woman standing on her own without being supervised by a man.

**107)** This was a baby-sitting measure so that while the male supervisor was absent on sabbatical, Miss O'Donnell as a woman would have a male "minder" to look after the woman.

**108)**     As of the time that Miss O'Donnell was fired on February 26, 2004, ISI had never

had a woman executive or manager who was not under the 'covering' of a man.

**109)**     Because of ISI's conservative beliefs, subscribing to a particular interpretation of

gender roles, during Miss O'Donnell's employment there, ISI expressed its organizational

beliefs that women must serve under a man's supervision or 'covering' and should not have

authority without being under the headship and authority of a man.

**110)**     In fact, Spencer Masloff expressed dissatisfaction and concern that ISI would be

hurt in raising money from ISI's donors if ISI's donors noticed that a woman, Christine

O'Donnell, was heading a department at ISI without being under the covering of a man.

**111)**     During Mr. Nelson's sabbatical, all the men who had reported directly to Vice

President Jeff Nelson reported temporarily to a different *Vice President at the same level*.

**112)**     By contrast, as a woman, Miss O'Donnell was the only employee working under

Vice President Nelson who was demoted and moved under a man at a lower, Director level.

**113)**     As a result, only a woman was treated differently from all other male employees.

**114)**     In a meeting about this with Jeff Nelson on or about February 11, 2004, Miss

O'Donnell asked Mr. Nelson about her demotion and this circumstances, and Jeff Nelson

explained the change by saying "Doug's an inside guy, you're an outside girl."

**115)**     Furthermore, at that meeting, Jeff Nelson explained that Miss O'Donnell was

being made to report to Doug Schneider as Schneider's subordinate because Mr. Nelson needed

a "proxy" to supervise Miss O'Donnell while Mr. Nelson was absent from the organization,

meaning that a woman could not stand on her own without a "proxy" man supervising her.

**116)**     Thus, ISI demoted Miss O'Donnell and ordered her to serve under an unqualified

man, Doug Schneider, so that during Jeff Nelson's sabbatical Miss O'Donnell would be under

the headship and authority of a man and would be serving under a man's authority.

**117)**     Despite ISI's attempted justification, there was no business reason for demoting Christine O'Donnell in Mr. Nelson's absence.

**118)**     Because Vice President Jeff Nelson would be absent from the organization, it would be highly irrational to initiate such a change in the organization just at the very moment when Mr. Nelson would be absent on sabbatical, if the reason were for business purposes.

**119)**     In fact, the disruption caused to ISI by changing personnel and chain of command would be highly illogical and harmful to ISI if implemented major changes during that exact time when Vice President Jeff Nelson would be absent during his sabbatical.

**120)**     It would be particularly irrational to place a man with no real experience in public relations whatever as the new head leading ISI'S entire public affairs efforts just when Mr. Nelson would be unavailable to supervise this young and unqualified man in his new position, would be unavailable to resolve and clarify questions about lines of responsibility, and would be unable to work with and guide the new Director of Communications and Public Affairs.

**121)**     In fact, in February 2004, when Doug Schneider attempted to give Miss O'Donnell directions in public affairs, Mr. Schneider was caught surreptitiously reading from *Miss O'Donnell's own 2004 strategic plan* in order to pretend to be qualified to discuss ISI's public relations plans and programs.

**122)**     Thus, Mr. Nelson knew that Mr. Schneider was not qualified to lead ISI's public relations efforts but gave Mr. Schneider Miss O'Donnell's own 2004 strategic plan as a cheat or crib sheet to use surreptitiously in order to pretend to be qualified to discuss ISI's PR plans.

**123)**     Thus, no credible business purpose could be served by making such a disruptive and confusing change while Mr. Nelson would be unavailable to oversee and implement the

change.  The only plausible explanation is unlawful discrimination against a woman.

**124)**      ISI's results in public relations and marketing after firing Miss O'Donnell shows a

marked decline and deterioration in ISI's effectiveness and success after Mr. Schneider

replaced Miss O'Donnell, further demonstrating that Mr. Schneider was not qualified to

supervise Miss O'Donnell, such as the sudden absence of ISI lectures broadcast on C-SPAN.

**125)**      Also, these explanations contradict how comparable situations are handled, in

which the opposite approach was employed, so that a woman (again) reports to a man.

**126)**      In the fund-raising department, where a male executive needed administrative

help, he was given a subordinate assistant reporting to him.  A woman reports to a man.  In

Miss O'Donnell's case, supposedly to give her the administrative help she was promised when

hired and had been asking for (meaning a secretary or administrative assistant under her,

working for her, and reporting to her, as a senior public relations expert), Miss O'Donnell was

told to a report to an inexperienced man and become Mr. Schneider's subordinate.

**127)**      Christine O'Donnell was and is highly qualified for the position she held.

### *E.   Defamation and Post-Termination Retaliation in the News Media*

**128)**      ISI publicly stated in a weekly supplement section of the News Journal, the

largest newspaper in Wilmington, Delaware that:

> "She was terminated for operating a for-profit business [using ISI's time and resources]," Elaine Pinder, spokeswoman, said last Thursday.

News Journal, Spark, Community Profile, page 9, April 14, 2004 *(punctuation in original)*.

**129)**      *This quote in the newspaper was the first time that Miss O'Donnell had been*

*given any reason for her firing* (besides vaguely "the relationship is not working out").

**130)**      Rather than being told directly, Miss O'Donnell first learned in the newspaper

that she was being accused of a crime – theft of ISI time and resources, without permission (as

the reason she had been terminated).

**131)**     Because ISI did not raise this explanation as a reason for her firing on February 26, 2004, at any time prior to April 14, 2004, the reason stated is clearly a false excuse or so-called pretextual explanation invented after the fact to artificially hide the true reason.

**132)**     As a pretextual explanation invented later, this is evidence that the true reason is known by ISI to be illegal and it is evidence that the real reason is unlawful discrimination.

**133)**     ISI also retaliated against Miss O'Donnell as a former employee as a result of her complaining of gender discrimination, which is a violation of Title VII of the Civil Rights Act.

**134)**     ISI accused Miss O'Donnell of committing theft of company property.

**135)**     The subject of the defamation is an alleged crime by Miss O'Donnell.

**136)**     The allegations published by ISI were theft of company resources in the context of Miss O'Donnell's employment and professional career, which even if not illegal would be of concern to any potential future employer or potential future client of Miss O'Donnell.

**137)**     These defamatory statements were made to cover up ISI's violations of Federal and State law, and to retaliate against Miss O'Donnell for seeking to have the law enforced.

**138)**     As such, ISI's statements were made with legal malice.

**139)**     Such retaliation and defamation to evade the enforcement of Federal and State laws are contrary to public policy.

**140)**     ISI's statements are *per se* defamation for which no proof of damages is needed.

**141)**     Yet, as a result of this defamation, Miss O'Donnell has suffered irreparable and severe harm to her reputation and career, including highly-lucrative, paid appearances on national news programs as a commentator, as well as public relations clients.

**142)**     Miss O'Donnell's profession, career, and professional strengths are her contacts

and relationship with journalists, who all read newspapers diligently and thoroughly, and would naturally be especially interested in news reports about someone they personally know.

**143)**     Thus, Miss O'Donnell's career and professional opportunities were significantly and materially harmed by ISI's defamation.

**144)**     Immediately after this accusation was made against her, national news programs stopped calling or inviting Miss O'Donnell to appear as a paid commentator on television.

**145)**     Despite Miss O'Donnell's efforts, she was unable to resume her previous status as a commentator on national television news programs, having only one appearance one year later, but completely losing the frequency of her previous appearances.

**146)**     Because Miss O'Donnell appeared as a commentator from a conservative perspective, ISI's accusation as a conservative political organization is especially damaging, because conservatives in the news media and in politics would tend to believe ISI's accusation.

**147)**     As a result, Miss O'Donnell lost substantial income from those appearances.

**148)**     Because ISI published, in the biggest newspaper in Wilmington, Delaware, their excuses for firing Miss O'Donnell directly harmed Miss O'Donnell's profession and career.

**149)**     Potential clients for professions such as public relations are extremely sensitive to accusations of wrongdoing and negative reputations, and will choose public relations experts who can represent them without any taint of shame, scandal, or wrongdoing.

**150)**     Miss O'Donnell has been unable to find either employment or private clients since these defamatory comments were published in the Delaware region.

**151)**     Only recently, as Miss O'Donnell has begun to look outside the region to try to find clients, has she begun very slowly to reassemble her career, more than 15 months later.

**152)**     However, ISI actually knew (or through its executives should have known) that

ISI's allegations concerning the reasons for Miss O'Donnell's firing were in fact false, including because ISI knew --

(A) that the reason for firing Miss O'Donnell was that she talked to the EEOC,

(B) that in fact ISI had demoted Miss O'Donnell because she was a woman.

(C) that ISI had explicitly approved Miss O'Donnell's work on The Passion of the Christ alongside her work at ISI,

(D) that ISI had no company policy against the use of its email and computer systems in the manner it now sought to enforce, with policies merely stating that ISI could read an employee's email and employees should exercise their own reasonable judgment.

(E) that ISI applied its policies concerning company computer email and resources in a *discriminatory* manner, allowing males in the organization to use ISI computers and company time to pursue personal, private interests such as projects by Jeff Nelson that Mr. Nelson asked Miss O'Donnell to help him with, and widespread use of company time and computers to pursue Amway (now Quixtar) businesses within Doug Schneider's Quixtar business group.

(F) that no other person had ever been disciplined or fired for this reason, except a woman fired with Miss O'Donnell, but in fact ISI widely tolerated the use of email for personal and outside business use *by males* in the organization.

(G) that Miss O'Donnell's ability to work on such projects alongside her work at ISI was an explicit condition of her employment at ISI,

(H) that Miss O'Donnell's ability to work on such projects alongside of her work at ISI, and her intended attendance at Princeton, was the reason why Miss O'Donnell was being paid only $65,000 per year for essentially a less than full time position, rather

than the $125,000 she had been offered for other, truly full-time positions,

(I) that Miss O'Donnell's ability to earn outside income such as by working for private

public relations clients and appearing on national news commentary programs was an

explicit condition of her employment, and one of the reasons why she was being paid

only $65,000 per year for essentially a less than full time position rather than the

$125,000 she had been offered for a full-time position.

(J) that ISI had explicitly approved Miss O'Donnell's simultaneous work for ISI and The

Passion of the Christ because contacts with journalists are the lifeblood of public

relations and any setting in which she might as a public relations expert get to know

journalists better directly benefited ISI in its public relations goals,

(K) that ISI had actually, knowingly and explicitly, paid for Miss O'Donnell's trip to the

screening of The Passion of the Christ for the benefit of meeting journalists, and

(L) that Miss O'Donnell's efforts for The Passion of the Christ resulted in ISI receiving

approximately 1000 new student members in its student programs.

### F.   Additional Facts of Discriminatory Intent

**153)**     In all of the events described and alleged below, even though ISI's actions created

disparate impact against female employees, ISI's actions were in fact intentional and knowing.

**154)**     In decision-making meetings among ISI executives, as well as in lectures which

ISI hosted as part of ISI's program activities, and in articles published as part of ISI's program

activities, ISI executives openly stated ISI's chauvinist beliefs that a woman requires the

supervision, authority, headship, or "covering" of a man.

**155)**     In decision-making meetings among ISI executives, ISI executives openly

mentioned or discussed, directly or indirectly, that ISI made personnel promotions, placement,

and restructuring decisions in conformity with ISI's beliefs that a woman requires the supervision, authority, headship, or "covering" of a man over the woman.

**156)**     ISI's official responsible for development and fundraising openly expressed worry that ISI's conservative donors might be displeased if they saw Miss O'Donnell heading a department without the supervision, authority, headship, or covering of a man over her.

**157)**     ISI also acted intentionally, willfully, and with legal malice because of its organizational mission in opposition to Federal laws limiting the rights of employers.

**158)**     As part of her duties to plan ISI's 50th Anniversary Gala event attended by approximately 1,100 people including very prominent political and business leaders, Miss O'Donnell was promised that the entire ISI organization was at her disposal, at her direction.

**159)**     In fact, all or nearly all male employees, managers, and executives of ISI openly refused to take Miss O'Donnell's directions as a woman, resisted her leadership as a woman, and made openly hostile comments at meetings directed against her as a woman.

**160)**     This included Jeff Cain rudely ordering Miss O'Donnell to "strap it on" – that is, put on a 'strap on' artificial male sexual organ used by women to act like a man in sexual acts.

**161)**     Section 711 of Title VII of the Civil Rights Act requires that every employer post notices in conspicuous places upon its premises where notices to employees, applicants for employment, and members are customarily posted which have been prepared or approved by the EEOC explaining employees' rights. *See, e.g.*, 42 U.S.C. SEC. 2000e-10.

**162)**     Miss O'Donnell does not recall ever seeing such notices posted, in spite of the requirement to conspicuously post such notes where other notices to employees are posted.

**163)**     On information and belief ISI did not and/or does not comply with this obligation.

*G.   Implausibility of Excuses Given for Demotion*

**164)** Federal precedents provide that an employer's creation of a "pretextual" explanation (that is, a reason invented to hide the true reason) for termination, adverse personnel actions, or demotion can be considered as evidence of workplace discrimination:

> "Resort to a pretextual explanation is, like flight from the scene of a crime, evidence indicating consciousness of guilt, which is, of course, evidence of illegal conduct."

Binder v. Long Island Lighting Co., 57 F.3d 193, 200 (2d Cir.1995).

**165)** *That is, the assertion of a false excuse for an employer's adverse action is in itself evidence that helps carry a plaintiff's burden of proof, by proving discriminatory intent.*

**166)** In fact, the history of discriminatory conduct in the law has nearly always been a game of hide-and-seek in which employers who discriminate against protected classes seek to get away with discrimination without being caught doing so, to evade the consequences.

**167)** Because of this, the law holds that a rationale presented retroactively that was not communicated clearly *prior* to a demotion or firing will be viewed as lacking credibility, suspect, and invented for the purpose of litigation rather than as a bona fide business purpose.

**168)** Jeff Nelson's February 6, 2004, email attempts to justify the demotion of Miss O'Donnell by reference to changes in ISI's public relations strategies.

**169)** However, those changes had *already* been fully implemented by Christine O'Donnell herself in November and December 2003, under her own leadership and management, without the need for any outside assistance in making those changes, well before these events unfolded, including by her development of a 20 page strategic public relations plan and strategy for ISI's public relations and marketing efforts for 2004 dated January 5, 2004.

**170)** Thus, Mr. Nelson's attempted rationale for the change was incredible, implausible, and untruthful. All the changes at issue had already been completed.

**171)**     In fact, as a result of Miss O'Donnell's implementation of the new strategy to

focus on regional media, Miss O'Donnell had already arranged a feature story on the cover of

Delaware Today, which was intended to be a promotion for ISI. But ISI had to be removed

from the story because ISI had already fired O'Donnell and could no longer be mentioned.

**172)**     Similarly, Miss O'Donnell was featured in a weekly section of News Journal, the

main Wilmington, Delaware, newspaper shortly after her firing, in another local news story that

Miss O'Donnell had arranged in order to implement Mr. Nelson's new strategy.

**173)**     At no time did ISI ever conduct a performance review of Miss O'Donnell, even

though ISI has retroactively attempted to characterize informal meetings and strategic planning

sessions for ISI's own operations as having been a performance review of Miss O'Donnell.

**174)**     In fact, at the "Wednesday" (January 28, 2004) meeting referred to in Mr.

Nelson's February 6, 2004, email, Mr. Nelson Miss O'Donnell confirmed that ISI was very

happy with Miss O'Donnell's work at ISI, and said only that Miss O'Donnell would be

working *"with"* Doug Schneider –  in other words Miss O'Donnell would continue training and

mentoring Mr. Schneider as an inexperienced subordinate as she had in the past.

**175)**     ISI repeatedly expressed and manifested strong satisfaction with, approval for,

and appreciation for the high quality of Miss O'Donnell's work on behalf of ISI.

**176)**     Repeatedly during her employment at ISI, when Miss O'Donnell honestly and

sincerely discussed her plans and career options with Mr. Nelson and others, ISI executives

urged her to stay at ISI and not to take or pursue other job offers, because ISI was very happy

with Miss O'Donnell's work at ISI and wanted her to continue with ISI.

**177)**     At no time did ISI ever give Miss O'Donnell any warning, communication, or

indication that her performance was unsatisfactory or needed to improve or that she might be

fired for any reason if any particular conditions were not met or that she was not in compliance with any employment policies or rules of ISI.

**178)**    At no time did ISI express dissatisfaction with Miss O'Donnell's work, except

    **(A)**    when ISI routinely scheduled two and three meetings from different departments at the same time on the same day, requiring Miss O'Donnell to attend two or three different meetings simultaneously,

    **(B)**    other departments or offices requested work priorities in conflict with the work priorities and scheduling of Miss O'Donnell's own direct supervisor.

    **(C)**    other offices requested work above and beyond Miss O'Donnell's responsibilities, and did not always get optional 'extra' duties performed.

    **(D)**    on one occasion senior staff erroneously thought that Miss O'Donnell had not completed her 2004 strategic plan for ISI because Jeff Nelson had failed to forward that plan on to the rest of the senior staff.  It later emerged that Mr. Nelson gave Miss O'Donnell's plan to Mr. Schneider instead in order to use it to make Mr. Schneider falsely appear to be knowledgeable on P.R.

**179)**    Although hired only to plan and supervise the project in terms of public relations, Miss O'Donnell planned and actually implemented in all details the October 2003 Gala event as an outstanding success, including with great public relations and publicity success.

**180)**    The Gala planned and implemented by Miss O'Donnell was a banquet event attended by approximately 1,100 people, including a taped address by the President of the United States George W. Bush, and with speakers including U.S. Supreme Court Justice Antonin Scalia, Senate Majority Whip Mitch McConnell, U.S. Senator Rick Santorum.

**181)**    Following the Gala, President Kenneth Cribb read aloud in staff meetings

numerous letters from very prominent political and business leaders praising the high quality and success of the Gala that was planned and implemented by Miss O'Donnell.

**182)**     At a May 12, 2004, unemployment hearing Jeff Nelson testified that the Gala which Miss O'Donnell supervised was a great success.

**183)**     According to Doug Schneider, Miss O'Donnell secured more news media coverage of ISI in her first few months than ISI had achieved in the previous 12 months.

**184)**     ISI's President Kenneth Cribb in turn highly praised Miss O'Donnell's success.

**185)**     Subsequently, although ISI diverted Miss O'Donnell from the job she had been hired to do, ISI has sought to blame Miss O'Donnell for having been diverted from her role.

  *H.   Lack of Just Cause – Implausibility of Excuses Invented After-the-Fact for Firing*

**186)**     The inconsistent, erratic, and continually-changing nature of ISI's excuses is in and of itself a reason to find ISI's excuses implausible and incredible.

**187)**     A pretextual excuse for adverse action is itself evidence of discriminatory intent.

**188)**     Five weeks after firing Miss O'Donnell – for the first time ever – ISI attempted to invent as a retroactive excuse the story that ISI had fired Miss O'Donnell for working to promote Mel Gibson's movie at ICON Productions The Passion of the Christ.

**189)**     After the fact, ISI accused Miss O'Donnell of promoting The Passion of the Christ and ISI now claims that it fired Miss O'Donnell for promoting Mel Gibson's movie.

**190)**     However, Miss O'Donnell sought – and received – ISI's permission for her work on The Passion of the Christ, including numerous incidents of co-marketing both ISI and that movie through cultivating contacts.

**191)**     In fact, Miss O'Donnell explicitly informed Mr. Nelson that she planned to attend a private screening of The Passion of the Christ simultaneously for Miss O'Donnell's own

private work promoting that movie but also to cultivate contacts with journalist for ISI.

**192)**    Public relations and media relations are uniquely artistic and personal exercises in which personal contacts with journalists and opinion-makers in social, non-standard, and unusual settings are often critical to success for a client like ISI.

**193)**    Contacts with journalists in relaxed social settings or seemingly diversionary or fun activities are often by far the best, and sometimes the only, way to cultivate the relationships and friendships that are crucial to a successful public relations effort.  Activities which allow casual and friendly contact with top journalists pay off directly and powerfully for the public relations goals of the organization.

**194)**    Thus, Mr. Nelson explicitly approved Miss O'Donnell's simultaneous work for ISI along with Miss O'Donnell's personal work for The Passion of the Christ *on ISI time.*

**195)**    In fact, as a direct result of Miss O'Donnell's work promoting The Passion of the Christ, ISI received approximately 1,000 new members for ISI's student programs.

**196)**    Moreover, ISI approved *and paid for* Miss O'Donnell's trip to the screening of The Passion of the Christ, with receipts and reimbursement form evidencing ISI's approval.

**197)**    As a result of her work for ICON Productions, Miss O'Donnell made outstanding contacts with news journalists on behalf of ISI, benefiting ISI, including contacts with a 60 Minutes producer, the owner of the Detroit Tigers and the owner of Little Caesar's Pizza.

**198)**    In this and many other respects, ISI explicitly approved Miss O'Donnell's personal work on the side for ICON Productions and The Passion of the Christ.

**199)**    In fact, in November 2003, when Miss O'Donnell discussed the possibility of leaving ISI to go to work full-time for ICON Productions, Jeff Nelson urged Miss O'Donnell *not* to leave and explicitly discussed and approved a third option of Miss O'Donnell working

on Mel Gibson's movie alongside her job for ISI as part of Mr. Nelson's attempt to persuade Miss O'Donnell *not to quit* her job at ISI to go to work exclusively for ICON Productions.

**200)**     Similarly, Miss O'Donnell met the owner of the Detroit Tigers and the owner of Little Caesar's Pizza through her work on Mel Gibson's film, and then offered to introduce ISI's Development Department to these extremely wealthy individuals to seek donations to ISI.

**201)**     Similarly, Miss O'Donnell recommended to ICON Productions that ICON *purchase* from ISI – on the same terms that ISI routinely makes available to all parties for profit – mailing lists from ISI's subsidiary, The Collegiate Network, which would have been a financial benefit to ISI and the Collegiate Network, *without* compensation to Miss O'Donnell.

**202)**     Furthermore, ISI is seeking $5 million from Rich DeVos based upon the allegedly Christian nature of ISI's mission.  Miss O'Donnell's work for The Passion of the Christ was a powerful advantage for ISI in terms of contacts and credibility for ISI with conservatives.

**203)**     Meanwhile, at a May 12, 2004, unemployment hearing ISI executives suggested for the very first time that in February 2004 Miss O'Donnell had been insubordinate to Doug Schneider, to whom she had been newly reassigned.

**204)**     This recently-created excuse is another pretext, which is further evidence of discriminatory intent because it was never stated previously and is therefore offered to cover up the true reason for Miss O'Donnell's firing, and also because it is a false statement.

**205)**     The only time when Miss O"Donnell refused to perform any work for Mr. Schneider, although she did express concerns about the restructuring and the lack of a revised position description on the advice of the EEOC, was when she used up an accrued sick day, as was her right as an employee, because she was sick with a migraine, and Mr. Schneider called her at home wanting her to perform a clerical or secretarial task.  Thereupon, O'Donnell

reminded Mr. Schneider that she had previously taken a sick day

### *I.   Discriminatory and Unequal Application of Employee Policies both an Implausible Pretextual Excuse and also an Additional Count of Unlawful Discrimination*

**206)**    If an employer consistently tolerates what may be considered misconduct (even if it happens to be willful and/or wanton misconduct), the employer *is not justified* in firing employees without first warning them that such conduct has become longer acceptable.  Ortiz v. Unemployment Insurance Appeal Board, Del.Supr. 317 A.2d 100 (1974).  *Accord*, EEOC v. Kohler Co., 335 F.3d 766, 774 (8th Cir. 2003), in which the employer failed to enforce its disciplinary policies uniformly, holding that "lax enforcement of [an employer's] company policies and disciplinary actions" *can actually be evidence of a discriminatory motive.*

**207)**    Not only is ISI's actions not excused by an alleged policy about email use, but inconsistent application against women is *evidence of unlawful discrimination* to establish Miss O'Donnell's claim of discrimination where ISI allows male employees to violate an ostensible policy, yet enforces that policy only against women.  Inconsistent assertion of an employment policy *in fact proves the discrimination*, by showing that the policy is not the true reason.

**208)**    ISI's employee manual only provides that ISI may *open* and *read* an employee's email, but places no restrictions whatsoever on an employee's use of email at the office.

**209)**    The only rules or guidelines ISI issued on the use of computers for internet and/or email is a Memorandum issued by John Lulves on December 3, 2002, in which ISI does *not* prohibit the use of the internet or email for personal use or for outside interests, but states that "[I]t is the obligation of each employee to use this resource responsibly by exercising good judgment regarding the reasonableness of personal use and sites visited."

**210)**    Thus, the only employee rule or guideline relevant to the use of email at ISI explicitly allowed each employee to *exercise good judgment*.

**211)**    Thus, ISI is now seeking to enforce a non-existent policy – *only against women.*

**212)**    ISI has never applied or enforced its alleged policies in the manner now claimed against any **man**, but only against two **women** in the same incident firing Miss O'Donnell.

**213)**    Widespread use of ISI computers to conduct private Quixtar/Amway businesses, for profit, and other activities including done by Mr. Nelson, is tolerated *when done by men.*

**214)**    As a result, ISI's attempted application of an ostensible policy on email and company resources against Miss O'Donnell and another female employee is yet another count of illegal discrimination against women, because the policy is *asserted only against women*.

**215)**    ISI is interpreting and applying its policies selectively based upon the gender of the employee, in violation of Title VII of the Civil Rights Act of 1964, as amended.

**216)**    However, ISI's excuse invented retroactively accuses Miss O'Donnell of having *received* a large number of emails concerning Mel Gibson's The Passion of the Christ.

**217)**    By not specifying the nature of the accusation when speaking to the newspaper, ISI falsely defamed Miss O'Donnell with the impression that she had stolen other resources.

**218)**    But ISI's retroactive pretext fails to recognize that *one of the biggest political discussions* at that time was about Mel Gibson's The Passion of the Christ, accusations that it was anti-semitic, and charges that the liberal news media were falsely attacking Mel Gibson.

**219)**    As a result, nearly every conservative in America was fervently debating mistreatment of Mel Gibson and his Christian film by liberals and the news media, by sending, forwarding, and sharing emails discussing the treatment by liberals of Mel Gibson's film.

**220)**    As a result, beyond her control, Miss O'Donnell received numerous emails at ISI concerning the public *discussion* of how Mel Gibson and his film was being mistreated.

**221)**    On information and belief, many if not most of ISI's executives and personnel

received similar emails concerning Mel Gibson's film, as well, during this time period.

**222)**     Such emails were not Miss O'Donnell's work for ICON Production but were unsolicited discussion on liberals attacking Mel Gibson, over which she had no control.

**223)**     Actually, Miss O'Donnell actually wrote about seven (7) emails on her ISI account relating to her work for Mel Gibson's The Passion of the Christ.

**224)**     Working from home, outside of company time, Miss O'Donnell used her email account at AOL to conduct her activities promoting The Passion of the Christ outside of business hours.  However, because of deficiencies with AOL in which emails are quickly deleted automatically, Miss O'Donnell did copy some emails written outside of work hours from home to her ISI account purely for the purpose of providing a backup copy.

**225)**     Based on the open and frequent use by male executives and employees of company email for personal purposes, she believed such minor use would be proper.

**226)**     In fact employees and officials working for Mel Gibson at ICON Productions can and will testify that Miss O'Donnell carefully scheduled meetings and activities outside of work hours at ISI, and scolded them if they ignored Miss O'Donnell's instructions not to contact her during her work for ISI, and told them she would return the calls later.

**227)**     Furthermore, on information and belief, a former Executive Director of the Collegiate Network, a male employee was handled differently when he fired a woman whom he had sexually harassed by talking to her about performing a sexual act as a condition of continued employment.  ISI did nothing until legal action was threatened.  Whereupon, ISI gave the offending manager a severance package of ***one year's salary***.

**228)**     Thus, once again, ISI treated a woman (Miss O'Donnell) differently than a man in how it terminated a manager accused of some ostensible wrong, further proving discrimination.

### *J.   Fraud in the Inducement and Fraudulent Recruitment and Relocation*

**229)**     In reliance upon ISI's offer of employment to move from Washington, D.C. to

Delaware, Christine O'Donnell moved to Wilmington, Delaware and purchased a home.

**230)**     Having undertaken a mortgage for this home, Miss O'Donnell was stuck in a

position of detrimental reliance and vulnerability by the time ISI's false promises became clear.

**231)**     In making its offer of employment and request for Miss O'Donnell to relocate, ISI

promised that Miss O'Donnell was being hired to supervise a staff.

**232)**     However, subsequent to ISI's offer of employment and request for Miss

O'Donnell to relocate, and after Miss O'Donnell in fact relocating, ISI changed Miss

O'Donnell's duties to supervising the planning of the annual Gala event in October 2003,

despite Miss O'Donnell's qualifications and title as Director of Communications and Public

Affairs rather than events planning, although with the understanding that her duties would be as

originally planned after the temporary project of planning the October 2003 Gala.

### *K.   Hostile Work Environment*

**233)**     Miss O'Donnell was placed in charge of the Gala event for ISI, a conference and

banquet which 1,100 donors, supporters, friends, business leaders, and news media attended.

**234)**     To perform this responsibility, Miss O'Donnell was given no staff or support, but

was expected to coordinate and direct the work of all of ISI's employees.

**235)**     As a result, all ISI employees were supposed to follow Miss O'Donnell's

directions and orders for the planning and implementation of the Gala event.

**236)**     In fact, however, the men at ISI openly refused to follow any directions from Miss

O'Donnell because she was a woman and openly defied Miss O'Donnell's requests, directions,

and orders for the successful completion of the project.

**237)**     For example, at one meeting for the planning and implementation of the Gala, Jeff Cain rudely ordered Miss O'Donnell to "strap it on" – that is, to put on a 'strap on' artificial male organ as used by women to act sexually like a man.

**238)**     Miss O'Donnell immediately went to Mr. Nelson to raise with him not only that one comment but the rude and uncooperative behavior and comments of all the men, frustrating Miss O'Donnell's attempts to organize and mobilize ISI to plan and implement the Gala.

**239)**     On information and belief, although Mr. Nelson promised to confront those men and/or correct the situation, ISI leaders in fact took no corrective action to remedy this conduct.

## LAW APPLICABLE TO MULTIPLE COUNTS

**240)**     To reduce duplication, the Plaintiff sets forth the following principles of law and incorporates these by reference within *all* of the Counts below as if fully set forth therein.

**241)**     Title VII of the Civil Rights Act of 1964 forbids discrimination in "Compensation, assignment or classification of employees" and "Transfer, promotion, layoff or recall" as well as "Fringe benefits" not only in the more obvious actions of hiring and firing. *See, generally,* Aman v. Cort Furniture Rental Corp., 85 F.3d 1074 (3d Cir. 1996).

**242)**     Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, codified at 42 U.S.C. §2000e-2, requires that:

> **Unlawful employment practices**
> **(a) Employer practices**
> It shall be an unlawful employment practice for an employer—
>
> **(1)** to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> **(2)** to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of

employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

**243)** The EEOC states the governing requirements as being the following: "that a *prima facie* case, coupled with a non-credible justification from the employer, is sufficient to support a finding of discrimination." EEOC Enforcement Guidance on *St. Mary's Honor Center v. Hicks,* EEOC Comp.Man. (BNA), N:3361, 3363 n. 3 (Apr. 12, 1994).

**244)** "As an administrative interpretation of the Act by the enforcing agency, these Guidelines, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." Meritor Savings Bank v. Vinson, 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986) (internal quotation marks and citations omitted).

**245)** Title VII prohibits not only intentional discrimination, but also practices that have the effect of discriminating against individuals because of their race, color, national origin, religion, or sex, which is known as practices or policies having a "disparate impact."

**246)** Federal courts interpret Title VII broadly as so-called 'remedial legislation'. *See, e.g.,* Anjelino v. The New York Times Company, 200 F.3d 73 (3d. Cir. 2000) (upholding claim by men for lost wages where discrimination against women inadvertently caused men losses).

**247)** A plaintiff does *not* need direct evidence of discrimination in order to prevail under Title VII of the Civil Rights Act of 1964 as amended. Desert Palace, Inc. v. Costa, 539 US 90, 101-02, 123 S.Ct. 2148 (2003). The Supreme Court held:

In order to obtain an instruction under §2000e—2(m), a plaintiff need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that "race, color, religion, sex, or national origin was a motivating factor for any employment practice." Because direct evidence of discrimination is not required in mixed-motive cases, the Court of Appeals correctly concluded that the District Court did not abuse its discretion

in giving a mixed-motive instruction to the jury.

*Id.*

**248)**     The Supreme Court ruled that Costa could use indirect evidence to prevail in her case. In other words, although Costa did not have proof of anti-female statements, she could use the disparities in men's and women's pay, benefits, discipline, etc. to show a general bias against women which, in turn, allows the jury to take the next step and conclude Costa was fired, in part, because she was female. *Id.*

**249)**     Here, bias against women as professional employees was a motivating factor in ISI's demotion of Miss O'Donnell, retaliatory discharge of her, ISI's discriminatory and unequal interpretation and application of its personnel policies and employment standards, and ISI's unequal and discriminatory interpretation and application of its alleged policies concerning the use of email, computers, and other company resources by Miss O'Donnell.

**250)**     In general, as determined and defined by Federal and Delaware law, Christine O'Donnell is a member of a protected class as a young, professional woman seeking equal opportunity in the workplace and compensation for her professional experience.

**251)**     Men as nonmembers of the protected class were treated more favorably.

**252)**     Claims of mixed motives for an adverse personnel action do not immunize an employer from accountability for unlawful discrimination. 42. U.S.C. 2000e - 2(m) provides:

> **Impermissible consideration of race, color, religion, sex, or national origin in employment practices**
>
> Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.

**253)**     Under the facts alleged, the Defendant cannot show by a preponderance of the

evidence that the unlawful discrimination was not a motivating factor in its adverse actions.

## COUNT I: DEFAMATION AND LIBEL UNDER DELAWARE LAW

**254)** The Plaintiff reasserts the allegations of paragraphs (1) through (237) and incorporate these by reference as if set forth herein.

**255)** On April 8, 2004, Elaine Pinder libeled and/or defamed Miss O'Donnell by verbally stating to a reporter for the News Journal, the largest newspaper in Wilmington and probably in all of Delaware, that Miss O'Donnell was fired for committing theft of company resources for Miss O'Donnell's work promoting Mel Gibson's film The Passion of the Christ.

**256)** On information and belief, ISI made these same statements or substantially similar statements to other journalists, as well, although news outlets did not publish them.

**257)** From the circumstances, ISI clearly intended for Elaine Pinder's statements about Miss O'Donnell to be published in the newspaper and to be read by the entire community.

**258)** Elaine Pinder was clearly making these statements as official statements of ISI and acting as ISI's agent in publishing the statements publicly.

**259)** In those statements, ISI falsely accused Miss O'Donnell of crimes and of moral turpitude through the theft of company and/or computer resources for her business interests and falsely claimed that theft of resources was the reason Miss O'Donnell was fired.

**260)** ISI knew that Miss O'Donnell had and would try to continue to make her living through her contacts and credibility with the news media as a public relations expert, and a media 'pundit' appearing (often for substantial pay) on national news commentary programs.

**261)** ISI knew that journalists are the most likely group to read the news, including the statements about Miss O'Donnell made by ISI in the Delaware newspaper.

**262)** ISI knew that journalists would actually know Miss O'Donnell and would pay

especially close attention to a story about someone they already actually knew personally

**263)** ISI knew that ISI's false statements about ISI's reasons for firing Miss O'Donnell would directly and severely harm Miss O'Donnell's reputation with journalists and the news media, being the most important group of relevance for her success in her career.

**264)** ISI also knew, or reasonably should have known that (a) another source of income for Miss O'Donnell might be with the company that she had worked with for The Passion of the Christ, ICON Productions, but that (b) allegations that Miss O'Donnell had supposedly committed theft of computer resources in promoting The Passion of the Christ would cause ICON Productions to be fearful of liability or scandal by hiring Miss O'Donnell again.

**265)** ISI's statement was knowingly and willfully false at the time it was made.

**266)** On May 12, 2005, ISI admitted under oath that it did not access Miss O'Donnell's emails until after she was fired.  Thus, nothing concerning her work on The Passion of the Christ allegedly shown by her email contents and/or email usage was known to ISI at the time ISI made the decision to fire her, and played no role in the reason to fire her on February 25.

**267)** Thus, ISI knew that Miss O'Donnell was *not* fired on account of her use of computer resources for The Passion of the Christ and knew that the statement was a lie.

## COUNT II:  FRAUD IN THE INDUCEMENT

**268)** The Plaintiff reasserts the allegations of paragraphs (1) through (237) and incorporate these by reference as if set forth herein.

**269)** As set forth in great detail above, ISI fraudulently induced Miss O'Donnell to accept employment on terms that were agreed upon, such that ISI promised Miss O'Donnell a radically different job from the one she in fact held after her arrival.

**270)** Whereupon Miss O'Donnell relocated from Washington, D.C. to Delaware and gave up her residence in D.C. in detrimental reliance upon ISI's promises, took on a mortgage obligation that tied her in place and put her in a financially vulnerable situation, and weakened her bargaining position and ability to object once she was in the job.

**271)** As set forth in great detail above, ISI actually changed the terms of employment and demanded that Miss O'Donnell perform a radically different job than promised, including by changing her work from high-level professional relations with the national news media to more mundane tasks, requiring Miss O'Donnell not to head a task force of 13 as promised but to implement most of the Gala work herself; by demanding that Miss O'Donnell perform work requiring 50 hours a week when ISI had promised her a support staff of 10 subordinate to her to complete much of that work; by demanding that Miss O'Donnell perform work requiring 50 hours a week when ISI had promised her a schedule that would allow her plenty of time to attend classed at Princeton University, to continue her paid appearances as a commentator on national television, and to maintain outside public relations clients.

**272)** That as a direct and proximate cause of these fraudulent acts, ISI attempted to obtain a $125,000 per year full-time public relations expert for only $65,000 per year when that salary was agreed upon for a minimal schedule in which Miss O'Donnell could pursue other for-profit projects and activities, with a staff of 10 reporting under her to implement the work.

**273)** As a result of ISI's fraud and deception as to what job it was offering her to relocate for, Miss O'Donnell was under-compensated by $60,000 per year for her actual work duties, restrictions on outside work and activities, and 50 hour per week schedule.

**274)** As a result, Miss O'Donnell lost her promised opportunity to appear on national television as a paid commentator, for profit, including when she was ordered by ISI to stop

such appearances, with enormous financial consequences past and future.

**275)** As a result, Miss O'Donnell lost her promised opportunity to maintain private public relations clients for profit on the side, losing additional income.

**276)** As a result, Miss O'Donnell lost her promised opportunity to attend Princeton, having been forced to withdraw, which will probably foreclose her from being accepted again in the future and will, at a minimum, cause her delay in earning a Master's degree by three years due to the college application cycle and her lack of funds after being fired.

**277)** In addition to the doctrine of fraudulent inducement, where Miss O'Donnell has acted in ***detrimental reliance*** upon ISI's false promises, the 'at will' doctrine is not applicable.

## COUNT III: RETALIATORY DISCHARGE ILLEGAL UNDER FEDERAL LAW

**278)** The Plaintiff reasserts the allegations of paragraphs (1) through (276) and incorporate these by reference as if set forth herein.

**279)** Title VII of the Civil Rights Act of 1964, including in Section 704(a) set forth at 42 U.S.C. 2000e-3, also prohibits employers from discriminating or "retaliating" against employees who "oppose" unlawful discrimination.  ISI further violated 42 U.S.C. §§ 2000e-3(a);  2000e-16;  and §2000e(k).

**280)** Miss O'Donnell participated in protected conduct, by beginning a complaint with the EEOC, seeking to know her rights through advice from the EEOC and legal counsel, implementing the EEOC's advice concerning her rights to a new position description.

**281)** Miss O'Donnell suffered adverse action, including

(a) termination decided less than 30 minutes after ISI's highest executives cleared up any confusion about the fact that Miss O'Donnell was beginning a serious complaint with the EEOC (rather than as they supposed merely a question about

vacation time and thus not a serious EEOC complaint), and

(b) Miss O'Donnell was instructed by the EEOC that she had a right to a new

position description upon being reassigned and/or demoted. Miss O'Donnell

believed the EEOC and told Mr. Nelson and Mr. Schneider that the EEOC had

advised her of her right to receive a new position description. Although ISI now

invents a prextextual excuse after the fact, ISI is knowingly retaliating against

Miss O'Donnell for seeking, following, and discussing EEOC advice with ISI.

**282)** Furthermore, "The defendant's awareness of the protected statement, however,

may be established by circumstantial evidence." Goldsmith v. City of Atmore, 996 F.2d 1155,

1163 (11th Cir. 1993)

**283)** Also, in *Robinson v. Shell Oil Co.*, 117 S.Ct. 843 (1997), the U.S. Supreme Court

held that Title VII prohibits employers from retaliating against current *and former* employees.

**284)** Here, not only did ISI fire Miss O'Donnell in retaliation but *after termination*, ISI

further retaliated against her in the news media by making false and defamatory statements

giving a false and pretextual reason for having fired her, accusing Miss O'Donnell of theft.

**285)** As set forth in detail above, Miss O'Donnell opposed the employer's unlawful

practices discriminatory to women, including her demotion from reporting to a Vice President

to reporting to an inexperienced man beneath the Vice President level.

**286)** As set forth in detail above, Miss O'Donnell participated in a proceeding covered

by statutes enforced by the EEOC, including by seeking the EEOC's advice, visiting the EEOC

starting on or about February 11, 2004, and following the EEOC's advice in attempting to

resolve the dispute at the EEOC's directions by requesting a new position description.

**287)** According to EEOC's Compliance Manual, an employee contacting an EEO

counselor is protected activity, for which retaliatory discharge is not allowed, regardless of whether the allegations are valid or reasonable.

**288)** Miss O'Donnell was then subjected to an adverse action by ISI, including firing.

**289)** ISI took the adverse employment action against Miss O'Donnell in direct retaliation for the activity protected by Title VII of the Civil Rights Act and to intimidate or "nip in the bud" similar assertions by other female employees. *See* Donnellon v. Fruehauf Corp., 794 F.2d 598, 601 (11th Cir.1986) ("The short period of time [ **(one month)** ] between the filing of the discrimination complaint and the . . . [adverse employment action] belies any assertion by the defendant that the plaintiff failed to prove causation.") *(emphasis added)*.

## COUNT IV: RETALIATORY DISCHARGE ILLEGAL UNDER DELAWARE LAW

**290)** The Plaintiff reasserts the allegations of paragraphs (1) through (276) and incorporate these by reference as if set forth herein, and the claim under Count III.

**291)** The Plaintiff asserts her corresponding rights under Delaware State law providing rights in parallel to those Federal rights set forth in Count III above.

**292)** Plaintiff reasserts the entire claim and legal theory set forth under Count III above and claims and asserts that those actions by ISI are also a violation of Delaware State law, and claims her rights under Delaware State law as well as a result of the violations alleged above.

## COUNT V: GENDER DISCRIMINATION ILLEGAL UNDER FEDERAL LAW

**293)** The Plaintiff reasserts the allegations of paragraphs (1) through (276) and incorporate these by reference as if set forth herein.

**294)** Miss O'Donnell is and was abundantly qualified for the position she held.

**295)**     Despite the chaotic nature of ISI's continually-changing definitions of Miss

O'Donnell's job assignments, despite the refusal of male personnel to follow her directions and

requests in planning the Gala, and even though she was assigned to tasks significantly different

from those tasks she was recruited, selected, and hired to perform (such as not merely planning

a 50th Anniversary Gala with a staff of 10 reporting to her, but instead actually implementing a

50th Anniversary Gala with practically no support until the eve of the Gala), *nevertheless* Miss

O'Donnell clearly met and in fact *exceeded* all of ISI's reasonable and legitimate expectations,

as repeatedly expressed by ISI executives during her employment, until well after her firing.

**296)**     ISI caused adverse action, including (a) first demoting Miss O'Donnell from

reporting to a Vice President and running all of ISI's public relations and marketing efforts on

her own authority to reporting instead to an inexperienced younger man – at only a Director

level – who was ordered to have authority over ISI's public relations and marketing efforts,

making Miss O'Donnell clearly subordinate to a less-experienced man, losing her authority

over ISI's public relation programs, and (b) subsequently terminating Miss O'Donnell.

**297)**     The facts above support an inference of discriminatory motivation by ISI.

**298)**     Alternatively, employment actions and policies created and applied by ISI created

a *disparate impact* which discriminated against women in their rights to equal opportunity in

the workplace. EEOC v. Joe's Stone Crab. Inc., 969 F.Supp., 727 (S.D. Fla. 1997).

**299)**     Miss O'Donnell was denied her rights under federal law to equal opportunity in

the terms of her employment and to be free from adverse personnel action based on gender.

## COUNT VI:  GENDER DISCRIMINATION ILLEGAL UNDER DELAWARE  LAW

**300)**     The Plaintiff asserts her corresponding rights under Delaware State law providing

rights in parallel to those Federal rights set forth in Count V above.

**301)** Plaintiff reasserts the entire claim and legal theory set forth under Count V above and claims and asserts that those actions by ISI are also a violation of Delaware State law, and claims her rights under Delaware State law as well as a result of the violations alleged above.

## COUNT VII: GENDER DISCRIMINATION ILLEGAL UNDER FEDERAL LAW

**302)** The Plaintiff reasserts the allegations of paragraphs (1) through (276) and incorporate these by reference as if set forth herein.

**303)** As set forth above, ISI has retroactively applied and enforced its company's ambiguous policies concerning internet access, computers, and email use by employees in a discriminatory manner based upon the gender of the employee.

**304)** ISI has repeatedly tolerated personal use of company email, computers, and internet access by males, including for for-profit activities such as Amway (now known as Quixtar) and for other outside activities other than for ISI business, including by Mr. Nelson.

**305)** However, although an excuse invented retroactively after Miss O'Donnell's demotion and firing, the only persons ever disciplined or fired by ISI for a violation of such policies were *women*, being Miss O'Donnell and Mrs. Holly Hosler.

**306)** After ISI invented a retroactive reason for having fired Miss O'Donnell based on supposed email usage, ISI also fired Mrs. Holly Hosler for having exchanged emails with Miss O'Donnell and – although all ISI employees were encouraged by the system administrator to delete any and all emails that were no longer required – for deleting emails from Miss O"Donnell before the excuse of email usage has been invented by ISI.

**307)** Thus, ISI has selectively enforced its company policies on the basis of gender.

**308)**     ISI's policy on these topics do not prohibit the conduct alleged against Miss
O'Donnell and Holly Hosler, yet ISI has sought to enforce policies outside and beyond their
clear terms in a manner that discriminates against women.  That is, for men, the policies have
one meaning, but now for women, the policies have an entirely different, stricter meaning.

**309)**     The facts above support an inference of discriminatory motivation by ISI.

**310)**     Alternatively, employment actions and policies created and applied by ISI created
a *disparate impact* which discriminated against women in their rights to equal opportunity in
the workplace.  EEOC v. Joe's Stone Crab. Inc., 969 F.Supp., 727 (S.D. Fla. 1997).

**311)**     Miss O'Donnell and Holly Hosler were denied her rights under federal law to
equal opportunity in hiring, the terms of her employment, salary, benefits, promotion or
demotion, and to be free from adverse personnel action based on her gender as a woman.

**312)**     *Only women* have been subjected to adverse employment actions pursuant to
these highly-questionable misinterpretations of policies of email usage, whereas *men* are
allowed to freely and openly use email and computers for any purpose, including for-profit
activities like Amway (now Quixtar) having nothing to do with ISI business, and men are not
only allowed but encouraged to delete any and all unwanted email.


## COUNT VIII: GENDER DISCRIMINATION ILLEGAL UNDER DELAWARE LAW

**313)**     The Plaintiff reasserts the allegations of paragraphs (1) through (276) and
incorporate these by reference as if set forth herein.

**314)**     The Plaintiff asserts her corresponding rights under Delaware State law providing
rights in parallel to those Federal rights set forth in Count VII above.

**315)**     Plaintiff reasserts the entire claim and legal theory set forth under Count VII and

claims and asserts that those actions by ISI are also a violation of Delaware State law, and
claims her rights under Delaware State law as well as a result of the violations alleged above.

## COUNT IX: CONSTRUCTIVE DISCHARGE

**316)**    The Plaintiff reasserts the allegations of paragraphs (1) through (276) and
incorporate these by reference as if set forth herein.

**317)**    Plaintiff reasserts the entire claim and legal theory set forth under Count III and
Count V above and claims and asserts that those actions by ISI are also a violation of Title VII
of the Civil Rights Act because they were an unlawful constructive discharge by ISI of Miss
O'Donnell in discrimination against her as a woman as a result of the violations alleged above.

## COUNT X:  HOSTILE WORK ENVIROMENT ILLEGAL UNDER FEDERAL  LAW

**318)**    The Plaintiff reasserts the allegations of paragraphs (1) through (276) and
incorporate these by reference as if set forth herein.

**319)**    ISI's actions, evidenced by the foregoing allegations, altered the terms, conditions
and privileges of Plaintiff's employment at ISI, unreasonably interfered with Plaintiff's work
environment, and created a pervasive, intimidating, hostile and offensive work environment for
Plaintiff at ISI, the toleration of which became a condition of Plaintiff's continued employment
at ISI, in violation of violation of 42 U.S.C. §§ 2000e-2(a)(1) and 2000e-16.

**320)**    ISI knew or should have known of the intimidating, hostile and offensive work
environment created by ISI employees, and was in fact so informed by Miss O'Donnell, but
failed to take meaningful corrective action.

**321)**    Miss O'Donnell was the subject of unwelcome harassment;

**322)**    The harassment was based on her protected status as woman.

**323)**     The harassment was sufficiently pervasive so as to alter the terms and conditions of Miss O'Donnell's employment and create a discriminatorily abusive working environment

**324)**     ISI is responsible for such environment under either vicarious or direct liability.

**325)**     Miss O'Donnell requested corrective action, but evidently none was taken.


## COUNT XI: HOSTILE WORK ENVIROMENT ILLEGAL UNDER DELAWARE LAW

**326)**     The Plaintiff reasserts the allegations of paragraphs (1) through (276) and incorporate these by reference as if set forth herein.

**327)**     The Plaintiff asserts her corresponding rights under Delaware State law providing rights in parallel to those Federal rights set forth in Count X above.

**328)**     Plaintiff reasserts the entire claim and legal theory set forth under Count X above and claims and asserts that those actions by ISI are also a violation of Delaware State law, and claims her rights under Delaware State law as well as a result of the violations alleged above.


## COUNT XII: VIOLATION OF THE EQUAL PAY ACT

**329)**     The Plaintiff reasserts the allegations of paragraphs (1) through (276) and incorporate these by reference as if set forth herein.

**330)**     Plaintiff reasserts the entire claims and legal theories set forth under all of Counts I through Count VII above and claims and asserts that those actions by ISI are also a violation of the Equal Pay Act because they were unlawful discrimination against Miss O'Donnell as a woman as a result of the violations alleged above.

**331)**     Because Miss O'Donnell was forced to work far more hours than male employees merely in order to earn the same salary, Miss O'Donnell was effectively paid less per hour and was denied her rights to equal employment and pay under the Equal Pay Act. 29 U.S.C. 206(d).

**332)** "Application of the equal pay standard is not dependent on job classifications or titles but depends rather on actual job requirements and performance." 29 C.F.R. §1620.13(d).

**333)** Moreover, ISI unlawfully discriminated among men and women in terms of fringe benefits, including the fringe benefit of using company email, computers, internet, and other company resources for personal use and personal business purposes, which benefit was and is extended freely to men as a benefit of their employment at ISI, but was denied to Miss O'Donnell and Mrs. Holly Hosler as women. See 29 C.F.R. § 1620.11.

**334)** The Equal Pay Act is to be liberally construed. 29 C.F.R. § 1620.34.

## COUNT XIII: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING IN EMPLOYMENT CONTRACT

335) The Plaintiff reasserts the allegations of paragraphs (1) through (276) and incorporate these by reference as if set forth herein.

336) Plaintiff reasserts the entire claims and legal theories set forth under all of Counts I and Count II above and claims and asserts that those actions by ISI are also a violation of the breach of the implied covenant of good faith and fair dealing pursuant to Delaware State law.

337) As a direct and proximate cause of this breach, Miss O'Donnell has been damaged for the same reasons and in the same amounts as claimed under Counts I and II.

**338)** Furthermore, where Miss O'Donnell has acted in ***detrimental reliance*** upon ISI's false promises, the 'at will' doctrine is not applicable, and breach of this covenant applies.

## COUNT XIV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

339) The Plaintiff reasserts the allegations of paragraphs (1) through (276) and incorporate these by reference as if set forth herein.

340)   Plaintiff reasserts the entire claims and legal theories set forth under all of Counts I through Count V above and claims and asserts that all of those actions by ISI also constitute intentional infliction of emotional distress under Delaware State law.

341)   As set forth in detail above, ISI clearly knew of the harm and emotional injury and emotional distress that its false and public accusation against Miss O'Donnell about the humiliating experience of her being fired for would cause to Miss O'Donnell.

342)   ISI clearly knew of the harm and emotional injury and emotional distress that would be caused to Miss O'Donnell by --

    a.   ISI publicly accusing her of the theft of company resources

    b.   a highly-experienced public relations expert with 15 years experience being ordered by ISI to perform secretarial and clerical duties subordinate to an inexperienced man whom she had previously been asked to train.

    c.   by ISI firing an experienced public relations expert with 15 years experience on account of her seeking her legal rights as a woman by consulting the EEOC.

343)   ISI engaged in these actions to intimidate Miss O'Donnell and other female employees from seeking and asserting their legal rights to equal treatment in the work place.

344)   As a direct and proximate cause of this breach, Miss O'Donnell has been damaged for the same reasons as claimed under Counts I through V, in an amount to be determined by a jury as damages for emotional distress, emotional pain and suffering.

**345)**   This emotional distress and pain is accompanied and evidenced by objective medical proof and physical manifestations that will be presented more fully at trial.

## CLAIM FOR DAMAGES FOR VIOLATIONS WITHIN THE ABOVE COUNTS

**346)** In addition to the facts alleged above, as a direct and proximate result of ISI's actions detailed above, and in the foregoing Counts of legal claims and theories, the Plaintiff has lost salary and benefits, and she is presently losing salary and benefits, and will continue to do so, and will suffer future pecuniary losses.

**347)** Further, as a direct and proximate result of ISI's actions as set forth in the foregoing Counts, the Plaintiff has further lost employment benefits including medical care, dental care, life insurance, accrued pension benefits, annual vacation of four weeks, paid holidays, credit toward social security benefits at retirement, and retirement benefits.

**348)** Furthermore, as a direct and proximate result of ISI's actions detailed above, the Plaintiff has and will continue to suffer emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, mental and physical pain and anguish, humiliation, embarrassment, and other injury and non-pecuniary losses,

**349)** Further, as a direct and proximate result of ISI's actions, the Plaintiff has further lost time responding to these wrongful acts, lost opportunities while responding to these wrongful acts, incurred legal expenses, lost time spent disputing false accusations, time spent explaining false accusations to potential employers and clients, and out-of-pocket expenses responding to ISI's false accusations.

**350)** The Defendant lost salary from ISI during March 2004 – July 2005 in the amount of **$86,666.67** so far, increasing at the rate of $5,417 per month that this case may continue.

**351)** The Defendant has lost salary health Insurance and other insurance benefits and fringe benefits worth $330 per month, in the amount of $5280 so far, increasing at the rate of $330 per month for each month that this case may continue.

**352)**     Having been fraudulently induced to accept a non-exclusive, less than full time

job at $65,000 per year to allow her to attend Princeton University and simultaneously pursue

paid TV appearances and other public relation clients and projects on the side, instead of a

$125,000 per year job that she was offered at about the same time, so that an equivalent,

exclusive job would have been worth $125,000 per year, Miss O'Donnell was paid only

$65,000 for a limited job but was instead required to perform a $125,000 per year public

relations expert on false pretenses.  Miss O'Donnell thus lost $60,000 per year for 16 months,

or **$80,000** so far, increasing at the rate of $5,000 per month that this case may continue.

**353)**     In addition, the Plaintiff also demands reinstatement for her unlawful firing,

pursuant to **Section 706 (g) (1)** of the Civil Rights Act of 1964 as amended, including back pay

for up to two years measured from the date of firing until the time of decision in this case, for a

total of $65,000 for two years or **$130,000**, plus lost benefits of insurance and the like.

**354)**     Having enrolled in Princeton and being forced by her ISI work schedule to

withdraw from courses already in progress, Miss O'Donnell incurred expenses of up to $500,

although she was able to convince Princeton to give her a refund of her tuition.

**355)**     Moreover, Miss O'Donnell has lost the increased earning power that a Master's

degree from Princeton would have created.  In the future, with proper finances, Miss O'Donnell

should probably be able to return and complete that program, however that increased earning

power has been disrupted and delayed for at least three years, given college application cycles,

and the damage to her reputation may prevent her from ever being accepted, creating a loss of

increased earning power estimated at up to $50,000 per year, for three lost years at $150,000.

**356)**     Furthermore, the Defendant has lost both the paid compensation and the future

value of national notoriety and prominence from appearances on national television news

programs as a frequent and popular political commentator prior to starting to work at ISI, which she lost when ISI presented Miss O'Donnell from pursuing these in her schedule after fraudulently changing the terms of her employment after fraudulently inducing her to accept a different job that would have allowed her to pursue and undertake those appearances, and after defaming her, which loss the Plaintiff calculates using standard methods in the industry from March 2003 and as lost continuing income in the future as potentially as high as **$2,000,000**.

**357)**    Before starting to work at ISI in March 2003, Miss O'Donnell's national television appearances averaged once a week, typically lasting 10 minutes, although sometimes an hour or longer such as on "Politically Incorrect with Bill Maher" on a paid basis.

**358)**    Because of a representation as dishonest now caused by ISI, Miss O'Donnell lost her professional standing and credibility with the media, which is a precious commodity among a closed and fickle community, and has and will over her life-time lost clients in private business as a public relations expert, and will suffer lower rates for clients she may win.

**359)**    Thus, Miss O"Donnell has suffered injury to her professional reputation, as will be analyzed, estimated, and presented by an economic expert, as being valued at up to **$1,000,000** in permanent, long-term damage to her lifetime career.

**360)**    Miss O'Donnell lost professional job opportunities, which made it hard for her to find new work, contractually freelance or full time, and/or private public relations clients.

**361)**    For at least six months after being fired, Miss O'Donnell suffered enormous pain, cried frequently at the sense of personal loss and failure caused by ISI, and at the sense of injustice, and could not sleep at night, often wide-awake, replaying the whole scene in her mind, until 5:30 am, and has suffered from understandable and resulting depression.

**362)**    This emotional distress and pain is accompanied and evidenced by objective

medical proof and physical manifestations that will be presented more fully at trial.

**363)**     Co-workers who were friends of Miss O'Donnell's now are not longer speaking to her or returning her calls after the defamatory statements by ISI.

**364)**     ISI caused the injury of isolation from Miss O'Donnell losing some of the only friends she had in a new region, having induced Miss O'Donnell to relocate to Delaware.

**365)**     Miss O'Donnell's mother and sister both noticed and spontaneously told her at the time, prior to litigation, that she was differently, and urged her to seek medical evaluation.

**366)**     Upon these and many other details of emotional pain, humiliation, emotional distress, and injury to be presented at trial, the Plaintiff seeks up to **$500,000** from the Defendant for emotional distress, pain and suffering,

**367)**     Moreover, as set forth in detail above, the actions of the Defendant were deliberately, intentionally, willfully, purposefully, and knowingly done in violation of Federally protected rights because of the Plaintiff's sex and in violation of the Plaintiff's civil rights.

**368)**     ISI's actions were outrageous and taken with an evil motive from the perspective of the law, undertaken with bad faith, and without any reasonable grounds to support them.

**369)**     ISI's actions were undertaken to suppress the rights of women to assert their lawful rights under Title VII of the Civil Rights Act, and were against public policy.

**370)**     ISI's actions were undertaken to 'nip in the bud' an assertion of a woman's equal employment rights free from workplace discrimination under Title VII of the Civil Rights Act.

**371)**     ISI's actions were undertaken to further ISI's political beliefs that Title VII of the Civil Rights Act is wrong and/or inappropriate, and/or overly broad.

**372)**     ISI's actions were legally malicious within the meaning of legal malice.

**373)**     ISI's actions were made with reckless indifference to Federally protected rights.

**374)** ISI's actions were undertaken with reckless indifference to the harm to Miss O'Donnell's future career and private business prospects as public relations expert, media consultant, political advisor, and paid political commentator.

**375)** Accordingly, substantial punitive damages are warranted against the Defendant and the Plaintiff seeks up to **$3,000,000** from the Defendant for punitive damages upon these and many other details to be presented at trial.

## DEMAND FOR TRIAL BY JURY

Pursuant to Fed.R.Civ.P. 38, Plaintiff respectfully demands a jury trial on all issues triable.

WHEREFORE, your Plaintiff hereby respectfully demands that this Honorable Court to enter judgment in favor of the Plaintiff against the Defendant, in the amount of up to **$6,952,447,** to the extent such damages may be proven at trial, finding the acts of ISI executives, officials, and personnel complained of herein as violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et. seq.*, as defamation and fraudulent inducement of contract and other breaches of her legal rights as set forth above, specifically

   A.  Direct Damages, including back pay and benefits under Section 706 upon reinstatement, and lifetime lost income and lifetime damage to reputation, as detailed above, totaling as much as $3,952,447.

   B.  Damages for emotional distress, humiliation, embarrassment, emotional pain, depression totaling as much as $500,000.

   C.  Punitive damages for ISI's willful, legally-malicious, and outrageous conduct, including conduct against public policy by evading the enforcement of Federal and State law, in the amount of up to $3.5 million.

D. Declaratory relief that the actions of ISI violate Title VII of the Civil Rights Act pursuant to under 42 U.S.C. § 2000e.

E. A permanent injunction enjoining ISI from further violations of Title VII of the Civil Rights Act and other laws claimed herein.

F. Appointment of a Delaware attorney to represent Miss O'Donnell pursuant to Section 706 (f) (1) of the Civil Rights Act of 1964, as amended.

G. The Plaintiff's attorney's fees and costs

H. Such other relief as the Court may find just and proper.

RESPECTFULLY SUBMITTED,
Miss Christine O'Donnell, *PRO SE*

Christine O'Donnell, Plaintiff
**Mailing Address:**
518 North Lincoln Street
Wilmington, Delaware 19805
Telephone: (202) 328-3357
Fax: (800) 222-5019 or (703) 783-0449