| | |
|---|---|
| **From:** | Christine O'Donnell |
| **To:** | Doug Schneider |
| **Date:** | 2/25/04 4:56PM |
| **Subject:** | Re: Memo |

Doug:

Thank you for your memo. Just to clarify, in early January, I did ask to take vacation time for the Jordan trip. And I DID NOT pursue the trip AFTER my conversation with Jeff. I was invited on this trip on January 19. I e-mailed Jeff asking him about it. I waited two weeks for before I got a response. In the meantime, I told them I was interested and would clear it with my boss, who at the time was Jeff. I continued with the paperwork because I could not imagine a reason I would be denied vacation time if this was not something ISI wanted me to attend as an ISI representative.

After meeting with Jeff, I did as I was asked and I did look into the other dates. It became clear that this trip would be my only opportunity to go. Since it was difficult to get a meeting with Jeff to discuss this with him, I sent the e-mail requesting vacation time to you. Again, I want to clarify that I did not pursue this trip AFTER my conversation with Jeff. And, as I told you in the meeting, I was willing to cancel last minute if I needed to. I did nothing wrong here.

Also, I want to clarify that my recent conversation with EEOC was not about vacation, but about my recent demotion and the grounds for my demotion.

Thank you for your time,

Christine

>>> Doug Schneider 02/25/04 04:37PM >>>
Christine,

Please see the attached memo. A hard copy has also been placed in your box.

Thanks,
Doug


**CC:**        Eileen Duke;  Elaine Pinder;  Jeff Nelson

**Memorandum**

To: Christine O'Donnell
Fr: Doug Schneider and Jeff Nelson
Re: Jordan Trip
Dt: 2/25/04
Cc: Eileen Duke, Elaine Pinder

Christine,

This is a written confirmation that your February 23 request for a vacation from March 1 to March 12, 2004 is granted. There was some confusion as to whether this trip was to be for official public relations business or a personal opportunity. Your only previous request on January 19 regarding a trip to Jordan was, as you put it, "on ISI's behalf." You also noted that there were three other possible trip dates. You were told by Jeff that the March 1 date would not work for ISI as there were several pending PR projects and needs. You were strongly encouraged to look into reserving a spot in one of the next trips. You were also asked to demonstrate in more detail what business advantage ISI would gain from your going on this trip and how it would advance the Institute's mission. Pending a satisfactory answer to those questions, you were told that ISI was happy to have you go as its representative on a subsequent trip and that it would not be counted as personal vacation time. As your recent February 23 email is the first time you asked officially for personal time to pursue the Jordan trip, it is the first time that your proposed absence was officially discussed in this light. You should know that we remain committed to letting you represent ISI (once the business advantage is satisfactorily demonstrated) at a time when it is mutually beneficial if you choose that option. This note confirms our willingness to grant your request to take the early March date as personal vacation.

However, we do want to express officially our concern that you pursued this trip to Jordan after being told in January that it was not a good time to take an extended business trip. After meeting with Jeff and agreeing to look into later dates for going to Jordan as an official ISI representative, you gave no further written notice as to your intentions regarding the proposed Jordan trip. Your revised request on February 23, one week prior to the proposed absence, to take the trip not as business but as vacation was your first such written notice following your January 19 proposal. In a meeting with Doug on February 24 you admitted that you had filed the application and were accepted for attendance, that you had made a "commitment" to the trip's organizers that you were going. You pursued

1

this without approval from your ISI supervisors. While you did say to Doug that you could "drop out" at the last minute, you indicated this was not a desirable option. Thank you for telling Doug about your recent conversations with the EEOC about labor regulations concerning vacation time. As you no doubt know, the EEOC does not regulate vacation time. In fact, there is no federal requirement regarding vacation. That is an agreement between employer and employee. In its 50-year history, ISI has maintained the highest commitment to its employees, especially regarding personal and vacation time. We remain steadfast in that commitment and are in full compliance with all state and federal regulations concerning labor practice. In terms of your own vacation, this is amply demonstrated in the 6 ½ vacation days you requested and were granted since your employment at ISI began on March 12, 2003. It is further reinforced by the generous personal time granted to you to take every Tuesday off from work so that you could take a class at Princeton from September through November 2003. This was all the more generous considering this class amounted to significant time away from ISI during routine business hours at one of the busiest and most significant periods in recent ISI history (namely the time approaching our 50th Anniversary Gala on October 23). As you are well aware, you are required to submit in writing all vacation requests. In the future, we ask that you give due consideration to the professional needs and schedules of ISI and submit in written form all requests for vacations, and in the case of vacation time of more than one week, to do so at least two weeks before the intended departure.

2

*file Copy*

February 20, 2004

John Lulves
Executive Vice President
Jeff Nelson
Vice President of Publishing
Intercollegiate Studies Institute
3901 Centerville Road
Wilmington, DE 19807

Dear John and Jeff;

   We have had some discussion about Jeff Nelson's decision to change my position and the leadership of this office. However, the more that we have discussed this, the more questions are raised and the less clear this move becomes.

   Although it may seem from your perspective that the change is simple enough, in actual practice the explanations create even more confusion and uncertainty and present immediate problems in how to proceed. Therefore, I must write that additional clarification is needed. And I present this in a more formal way so that the answers perhaps might be carefully thought out so as to reduce rather than multiple any questions.

   Jeff Nelson's e-mail on February 6, 2004, explaining the rationale for the change agreed with my long-standing concerns about the lack of the administrative support that I was promised when I was hired. Rather than the team of employees I was supposed to supervise, I found on arriving that I had no actual staff or administrative support. I have often noted that ISI could enjoy more results if this situation were changed. You hired me because of my extensive contacts in the press and knowledge of how to spread a message and disseminate a desired image. I was offered a regular segment on MSNBC, but Jeff told me to turn it down because it would interfere with the planning of the Gala.

   However, Jeff's February 6, 2004, e-mail suggests that the current change in my position will somehow achieve those goals. Jeff wrote "As I mentioned to you, this will be of enormous help to you in doing your job." However, your decision is actually *removing* me from my job, and therefore it remains entirely unclear how removing me from my job will help me in doing my job. I think you can appreciate how incomplete that explanation is.

   The only way that I can interpret Jeff's explanation is that Doug will now take over all administrative and essentially clerical chores in this office, and I would be freed up to work exclusively with the media and community on a professional level. In other words, under Jeff's explanation I would now perform _no_ administrative, clerical, or secretarial work, but would be freed up to focus exclusively on higher-level, professional, public relations work. It remains unclear, though, why this would be achieved by placing Doug as my supervisor. It seems like a rather unorthodox way to provide an assistant to a highly-qualified professional, by stripping her

of her position.

Instead of Jeff's explanation, however, it is now being suggested to me that my duties will actually now be *more* administrative, rather than less. As it has been further explained to me, I am being demoted in my duties so that I will in effect become Doug Schneider's press assistant, if not his research assistant.

I was told that Doug would be handling the daily operations, ensuring deadlines are met, and the like. This is the reason, I was told, that I would be reporting to him. Yet, Jennifer performs similar duties for Development, and Jeff Cain does not report to her. I was also told that Doug has been at ISI longer than I. Again, Jennifer has been at ISI longer that Jeff, and he does not report to her.

As you can see, such explanations are directly in conflict with each other and create confusion about the immediate next steps and indeed how to work on a daily basis. Am I to have *no* clerical chores or administrative worries whatsoever and to function exclusively as a professional? Or am I to become Doug Schneider's administrative assistant and perform almost exclusively clerical chores? These are two mutually-exclusive scenarios and this ambiguity makes it difficult to proceed with ISI's work, on a daily basis.

As you know, I supervised a support staff at the Republican National Committee. While there, I created a marketing strategy that Haley Barbour and the Washington Post credited as being of national importance and impact. In 2000, when Candace Bergen was given a new talk show, the producers hired me in to assist in her TV training.

You knew my experience when you hired me. Notwithstanding Jeff's February 6 e-mail, becoming Doug Schneider's press assistant is by no means giving me administrative support. You knew from my experience and resume that I have been the supervisor of administrative staff and "administrative support" means employees reporting directly to me, not me being subordinate to a male supervisor. The written e-mail record makes this abundantly clear, and also makes clear that there are no valid grounds for any change.

Last March, during the interview process with John Lulves and Jeff Nelson I specifically asked if my duties would include the very tasks that Doug Schneider now believes I should be doing, and I was assured that my job would not include lower-level press assistant duties. Therefore, these are not part of my duties now, as I specifically asked this question and was clearly told no. Otherwise, it is undeniable that you have changed my position, demoted a woman, and substituted a far less-qualified man for my job.

It remains confusing why you would put someone with 15 years marketing experience under someone with just a few years internal experience, who began work at ISI straight out of college. I have a proven track record for successful marketing. I know what resources I need to achieve that success, specifically a staff that reports directly to me, with me as the supervisor, not "sharing" staff as we have tried to do with the "PR posse."

In addition, the idea of a re-organization does not explain the change in my own position

rather than simply tasking me with modified goals as I continue in the position of Director. The fact is that we discussed the change in focus from national to local back in December. I have already implemented that change. Therefore, there is no justification for changing my position now.

I began contacting local media, sending them the media kit and I have already met several times with a local editor pitching the ISI story. I reported this to both Spencer and Jeff Nelson. I spent the holidays incorporating Spencer's PR goals into my 20 page proposal for ISI's 2004-2005 goals. No other senior staff members were aware of this document, as Jeff had asked me not to share it. As a result, it appeared that I missed my deadline.

Undeniably, I am vastly more qualified to direct and strategize ISI's PR efforts than the man you replaced me with. Regardless of whether the mission of the office is national or local, it would be very hard to explain why a 26-year-old man who joined ISI in a clerical position straight out of college would replace a more qualified woman with 15-years of experience in public relations.

Clearly, I am more qualified to lead the PR effort regardless of whether it is defined as originally conceived or in the new plan started last December. In fact, if there were a change, that is when an organization would call upon the most experienced professional available to plan and implement a change in public relations strategy (which had already occurred last December, not in February, so it cannot explain nor justify a change in my position now.) A man with very little experience would not logically be chosen for such a task.

This change was announced simultaneously with Jeff's departure for a sabbatical on February 2. Naturally, a re-organization by a Vice President makes little sense while that Vice President is absent from the organization. If a re-organization were actually called for, then the responsible Vice President, to whom the office directly reports, would be on hand to oversee and implement the changes. The fact that Jeff is absent from the scene, and the change was announced only upon his departure, suggests that a re-organization does not really explain these changes. The explanations given would explain the change only if you had waited for Jeff to return before making disruptive changes. As things were done, they unfortunately offer only a different possible explanation.

The way that this change has come to pass, it may be that you are thinking that demoting an employee is not as legally serious as terminating an employee. However, as I understand it, the same legal principles and formalities apply to stripping a person of her position and demoting an employee to a less-senior position as would apply to outright termination.

Needless to say, I have never had any negative performance rating. Well, the truth is I have not had any performance appraisal. ISI has not observed any of the formalities that would be required to document performance that is not satisfactory. Clearly ISI has not taken any steps that would be required to justify such a demotion in position. There is no record of any dissatisfaction with my work, as well as no reality of any dissatisfaction whether in writing or not. I have continually advised you of my work and received no indication of any problem or dissatisfaction. It is simply not credible to suggest that my work has been anything but

successful if not superior. And no one has ever communicated to me his dissatisfaction with work that I am responsible to perform.

In fact, over Christmas, while others were on vacation, I put in extra time to develop an extensive public relations plan for ISI. I presented this 20 page paper to Jeff Nelson in early January. I received no negative comments whatsoever. Rather, Jeff told me a week later "It looks great" and proposed a meeting to discuss the organization's PR plans a week afterward, which was canceled. Two other Vice Presidents expressed surprise to me that the PR proposal had already been submitted, as a copy had not been shared with them. Obviously, no considered decision was made by the organization, as the PR strategy of ISI was not discussed among other VP's, who never saw a copy of the plan, nor with the Director of Public Relations, whose planning meeting on the subject was cancelled by Jeff Nelson.

If ISI were contemplating a shift in PR strategy, this planning document would provide the obvious opportunity to review and discuss the PR goals of the organization for the coming year, which was the idea. Naturally, the Director of Public Relations would have to be involved in any such strategic planning and would be asked to comment and analyze the PR program in concert with the organization's goals. But instead, I was not involved in any such discussions. A change in the PR plan for the organization would not logically be made without the Director's -- especially not when the Director has just invited such a discussion with a lengthy planning document.

I was also told that "someone needed to be {Jeff Nelson's} proxy" in his absence. Yet, this change is not temporary. Nor will the other male Directors be reporting to Doug. I was told that Paul will be reporting the John Lulves because John has a background with the web. Using this logic, wouldn't it make sense for me to report to Mike Ratliff given that Mike has a background in marketing?

There is no rational explanation for this disparate treatment.

Unfortunately, this makes it hard to resist some unpleasant ideas, because no other explanations are left standing. And this saddens me. We of course want to assume and believe the best about people. However, I am having a hard time making sense of these changes.

On February 2, Jeff Nelson left on sabbatical. This would leave me, a woman, working without direct supervision of a man. Simultaneously (not before or after but simultaneously) and with unsatisfactory explanations, a woman Director has been demoted and replaced with a far-less-qualified man.

When people tell me in social gatherings that ISI has previously been accused of discrimination based on gender, what does this leave a woman executive to think? How am I supposed to understand this? Under Federal laws implementing the 14th Amendment, one may not make personnel decisions based on gender, and as just explained, no other explanation is plausible in this situation. Of course this does not change whether the personnel decision is a demotion or termination or whether the original position is under a contract or not.

It seems that something here has not been well-thought out. Either the original decision has gone astray from its original concept, and/or has not been explained properly, or else a decision was made in haste that in reality runs afoul of some problems that were not thoroughly considered.

As you can see, this situation raises more questions than it answers. There are some internal contradictions and some unfortunate ramifications that surely cannot be what you intended. Therefore, I am asking that these concerns and questions be clarified. I do not see how these concerns can be put to rest without reversing the decision made. However, perhaps you will be able to explain this more clearly. Please advise us of what you actually intend in this matter and how we will be able to proceed.

Naturally, it would be hard for anyone not to be offended by having been treated in this way. Beyond the clear legal questions, there is no doubt that ISI has never remotely approached the promises that John Lulve and Jeff Nelson personally made to me when I was hired, when I made it very clear that I would be turning down some high-level and high-paying alternatives to take the job at ISI. There was no doubt whatsoever of the prominent, prestigious, and professional positions I was in the market for and eligible for, and ISI promised me the same level of position here. There could not have been any lack of understanding by ISI of what position I was being hired for. And the promises made in response to my direct questions have never been kept.

Despite this irrational treatment, I am willing to discuss these matters with you and keep an open mind.

Part of what is needed immediately is a clear, written decision as to whether you are expecting me to perform the very tasks that I asked you about last March and you assured me my work was higher-level and would not include those press assistant duties. Until I receive a clear, written directive changing what John Lulves and Jeff Nelson personally assured me on this exact question I have to believe that I can trust those promises made to me last March.

Thank you for your time and consideration of this serious matter. I am eager to discuss this with you. I will contact Eileen Duke so we can arrange a meeting.

Sincerely,

Christine O'Donnell

2/20/04

Cc:    Eileen Duke

**From:**     Christine O'Donnell
**To:**       Jeff Nelson
**Date:**     2/9/04 9:47AM
**Subject:**  Re: Clarification

Jeff:

Thank you for the clarification. May I ask what lead to this decision? When I was at the RNC I had a support staff of 5 under me. I created a marketing strategy that Haley Barbour and the Washington Post credited as contributing significantly to the historic 1994 GOP House Sweep. In 2000, when Candace Bergen was given a new talk show, the producers hired me in to assist in her TV training. If I had an administrative staff here, I could do the same for ISI. Therefore, I am confused as to why you would put someone with 15 years marketing experience under someone with just a few years internal experience. I have a proven track record for successful marketing. I know what resources I need to achieve that success, specifically a staff that reports directly to me, not "sharing" staff as we have tried to do with the PR posse.
As you know, I believe fully in the mission of ISI. I am committed to it. I would like to set up a meeting with you so that we can discuss possible alternatives to your scenario.
Thank you,
Christine

>>> Jeff Nelson 02/06/04 02:41PM >>>
Christine,

I got your phone message but thought it best to reply in writing since our last meeting together did not serve to communicate the message sufficiently.

As we discussed at some length last Wednesday, my sabbatical and trends within the organization required me to re-think the entire marketing, sales, communications/PR operation at ISI. My judgement is that both the marketing/PR effort and the personnel involved are best served by a modest reorganization. Specifically, I am putting all Marketing, Sales, and PR/Communications efforts under Doug Schneider's direct supervision effective immediately.

This means that you will report to and work with Doug to advance ISI's PR needs. As I mentioned to you, this will be of enormous help to you in doing your job. Doug is an excellent manager and administrator. He will be able to structure a day-to-day, week-to-week action plan, including ways and means strategy, that will ensure both the department's and your own success. You have said to me several times that you need Admin help and a big part of that equation is management, especially time management, direction, and prioritization.

Again, as you told me, your great gift is networking and promotion. This arrangement will free you up to do just that on a daily basis without a lot of Admin headaches. I believe this plays directly to your strengths, and Doug's. Together you will make a formidable team. The organization is counting on that.

You will find Doug a fair, organized, and encouraging colleague. I know how much he respects you and your abilities. He is anxious to get to work with you to advance the global PR needs of ISI.

Thanks in advance for your cooperation.

-Jeff Nelson

**CC:**       Eileen Duke

# ISI Employee Chart
## (Pre Jeff Nelson's Sabbatical)



Ken Cribb
President

- John Lulves — Exec. Vice President
  - Elaine Pinder
- Jeff Nelson — VP of Publications
  - Christine O'Donnell
  - Doug Schneider
  - Paul Rhein
  - Bryan Auchterlonie
- Mike Ratliff — VP of Programs
- Spencer Masloff — VP of Development
  - Jeff Cain
  - Jennifer Connelly

Post Jeff Nelson's Sabbatical: *Bryan Auchterlonie now reports directly to Ken Cribb. Paul Rhein and the other male directors under Jeff were reassigned to other VP's.*

## Publications Chart

As shown to Christine March 2003 by Jeff Nelson



Christine O'Donnell

Doug Schnieder

Jeff Nelson

Mark Henrie   Jeremy Beers

Bryan Auchterlonie

*While Doug did report directly to Jeff, this chart indicated that Christine's position was a more senior position than Doug.

As shown to Christine February 2004 by Doug Schneider



Doug Schnieder

Christine O'Donnell

Jeff Nelson

EEOC Form 161 (10/96)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To: Ms. Christine O'Donnell
518 N. Lincoln Street
Wilmington, DE 19805

From: Equal Employment Opportunity Commission
Philadelphia District Office
The Bourse
21 S. Fifth Street, Suite 400
Philadelphia, PA 19106-2515

[  ]
*On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR § 1601.7(a))*

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 170-2004-01983 | Legal Unit | (215) 440-2828 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[  ]    The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[  ]    Your allegations did not involve a disability that is covered by the Americans with Disabilities Act.

[  ]    The Respondent employs less than the required number of employees or is not otherwise covered by the statues.

[  ]    We cannot investigate your charge because it was not filed within the time limit required by law.

[  ]    Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

[  ]    While reasonable efforts were made to locate you, we were not able to do so.

[  ]    You had 30 days to accept a reasonable settlement offer that afford full relief for the harm you alleged.

[ X ]    The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

[  ]    The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[  ]    Other *(briefly state)* _____

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you.  You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS** from your receipt of this Notice; otherwise, your right to sue based on this charge will be lost.  (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

Marie M. Tomasso, District Director

April 5, 2005

*(Date Mailed)*

Enclosure(s)

cc:    Intercollegiate Studies Institute
       Barry M. Willoughby, Esquire  (For Respondent)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court <u>under Federal law.</u>*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS** --     **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),**
**or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date.** Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS** -- **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: backpay due for violations that occurred **more than <u>2 years (3 years)</u> before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/96 to 12/1/96, you should file suit <u>before 7/1/98</u> -- *not* 12/1/98 -- in order to recover unpaid wages due for July 1996. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice <u>and</u> within the 2- or 3-year EPA backpay recovery period.

**ATTORNEY REPRESENTATION** -- **Title VII and the ADA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do <u>not</u> relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE** -- **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request <u>within 6 months</u> of this Notice.** (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

# INTERCOLLEGIATE STUDIES INSTITUTE
## *Director of Public Affairs*
## Job Description

The Intercollegiate Studies Institute (ISI) is seeking applicants for a new full-time position in its publications/publicity department. This new Director of Public Affairs position is a terrific opportunity for anyone interested in an executive career in publicity, marketing, communication, and institutional outreach and who wants to be part of thriving, nationally-recognized educational organization. This position will assume primary responsibility for developing the outreach components to ISI's 50th Anniversary Project. It will especially be responsible for publicity and message management. This position will report to ISI's Vice President, Publications. Candidates should possess at least five years of communications and development experience, as well as demonstrable writing skills, . All resumes should be sent to ISI and directed to Jeffrey O. Nelson, Vice President.

The responsibilities of the new Director of Public Affairs include:

- First, the new hire will be responsible for general Campaign marketing.

- Second, the new hire will take a lead in general institutional marketing—which encompasses Campaign marketing—and be an integral part of ISI's internal Public Relations Committee.

- Third, the new hire will manage planning, implementation, and publicity for the ISI 50th Anniversary Gala.

- Fourth, the new hire will direct and develop marketing strategies to more effectively present the Institute to current and potential donors, and assist in donor cultivation and solicitation of major gifts.

- Fifth, the new hire will direct and develop media awareness of ISI's educational and Campaign message(s), providing on-air commentary and opinion from an ISI perspective in national print, radio, and t.v. outlets.

- Sixth, the new hire will be expected to work on average forty-hour weeks, generally between 9 a.m. and 5.pm., or as negotiated with VP, excepting when deadlines require a greater time commitment (beyond which compensation time is granted to employee as agreed upon with supervisor). Vacation policy is set by VP.

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Philadelphia District Office
21 S. 5th Street, Suite 400
Philadelphia, PA 19106-2515

Ms. Christie Clewell
519 North Lincoln Street
Wilm., De

1988