## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CHRISTINE O'DONNELL,          :
                                    :
           Plaintiff,            :      C.A. No. 05-457 JJF
                                    :
          v.                  :      **JURY TRIAL DEMANDED**
                                    :
INTERCOLLEGIATE STUDIES       :
INSTITUTE, INC.,                    :
                                    :
          Defendant.         :

## AMENDED COMPLAINT

Plaintiff, Christine O'Donnell (hereinafter "Ms. O'Donnell"), brings this action against the Intercollegiate Studies Institute (hereinafter "ISI"), for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000, *et seq.* (gender-based discrimination and retaliation); the Equal Pay Act, 29 U.S.C. § 206(d); Delaware's Discrimination in Employment Act, 19 *Del.C.* §§ 710-718; common law claims under applicable law, including, without limitation, defamation, fraudulent inducement, intentional infliction of emotional distress, breach of the implied covenant of good faith and fair dealing, breach of contract and tortious interference with business opportunity. In support thereof, Ms. O'Donnell states as follows:

## JURISDICTION AND VENUE

1.      The jurisdiction of this Court is invoked pursuant to Section 706(f)(3) of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e, *et seq.*; the Civil Rights Act of 1991; Pub L. 102-166, 105 Sta. 1071; and 28 U.S.C. §§ 1331, 1337, 1343, 2201 and 2202. Pendent jurisdiction over state law claims is proper under 28 U.S.C. §§ 1331, 1332 and 1337.

1

2.    Venue is proper in the District of Delaware pursuant to 28 U.S.C. §1391(b) and (e), and

42 U.S.C. § 2000e-5(f)(3), because the unlawful employment practices were committed

within this judicial district.

3.    Ms. O'Donnell has fulfilled all appropriate administrative pre-requisites for this action by

timely filing a Charge of Discrimination with the Delaware Department of Labor

(hereinafter "DDOL") and the Equal Employment Opportunity Commission (hereinafter

"EEOC").  She received a Right-to-Sue notice from the EEOC on April 7, 2005, and filed

her original Complaint in this Court on July 1, 2005; within the 90-day period of time for

filing the Complaint.  A copy of the Right-to-Sue notice is attached hereto as Exhibit

"A".

## PARTIES

4.    Ms. O'Donnell is an adult individual and a resident of the State of Delaware.  She was

employed by ISI as Director of Communications and Public Affairs from March 12, 2003

through February 26, 2004.  Ms. O'Donnell is a public relations and marketing

professional who, at the time she was recruited and hired by ISI, had extensive experience

and significant contacts and relations with the national news media.  For purposes of this

action only, Ms. O'Donnell may be served through her undersigned counsel.

5.    ISI is a corporation qualified to conduct business in Delaware, with offices located at

3901 Centreville Road, Wilmington, DE 19807, which through its activities and the sale

and distribution of written materials and publications engages and participates in

interstate commerce.  ISI is an educational/academic organization dedicated to limited

government which studies issues of public policy and disseminates information and

2

opinions on such topics, and is colloquially known as a "think tank."  Among the many issues which ISI studies and issues commentary and opinions on are legal matters, including employment law and policies.  ISI has extensive knowledge of employment law, including prohibitions against gender discrimination.  ISI may be served through its counsel of record in this action.

6.    At all times relevant to the matters described in this Amended Complaint, the following persons were directors, officers, employees and/or agents of Defendant: T. Kenneth Cribb, Jr. ("Mr. Cribb"); Jeff Nelson (Mr. Nelson"); Eileen Duke ("Ms. Duke"); Elaine Pinder ("Ms. Pinder"); P. Michael Ratliff ("Mr. Ratliff"); John Lulves ("Mr. Lulves"); H. Spencer Masloff ("Mr. Masloff"); Doug Schneider ("Mr. Schneider"); and Jeff Cain ("Mr. Cain").  These individuals are discussed hereinafter in connection with the facts and circumstances surrounding Ms. O'Donnell's employment with ISI.  At all times relevant, ISI had well over fifteen (15) employees.

## BACKGROUND

7.    In February 2003, Mr. Nelson, on behalf of ISI, contacted Ms. O'Donnell at her home in Washington, D.C., regarding a new position ISI was creating.  Mr. Nelson, who was and is a Vice President of ISI, is the executive to whom Ms. O'Donnell reported for the majority of her employment with ISI and had actual or apparent authority to negotiate the terms and conditions of her employment.

8.    Ms. O'Donnell initially expressed reservations about this position, as she had applied for admission to a Master's Degree program at Princeton University, to start in the fall of 2003, and was concerned that the ISI position would not fit with her plans.  Ms.

O'Donnell also raised concerns about her ability to continue to pursue independent, profit-making activities such as appearing on national television, doing public relations work for other clients, and pursuing similar opportunities.

9.    Mr. Nelson, Mr. Lulves, an ISI Executive Vice President, and Mr. Masloff, an ISI Vice President, participated in further negotiations with Ms. O'Donnell concerning the ISI position and had the authority to negotiate the terms and conditions of her employment. These ISI representatives allayed Ms. O'Donnell's concerns by making representations and promises that she would have ample time for her independent pursuits. Mr. Nelson specifically stated that ISI would work with her schedule and be flexible with hours to make sure she could attend classes towards her Master's Degree. He actively encouraged her to pursue her studies towards a Master's Degree at Princeton. The specific representations and promises from Mr. Nelson, Mr. Lulves and Mr. Masloff, on behalf of ISI, were material and significant factors in Ms. O'Donnell's decision to accept employment with ISI.

10.    Mr. Nelson, Mr. Lulves and Mr. Masloff assured Ms. O'Donnell that she would be allowed time to pursue independent, for-profit activities with other clients and work on projects separate from ISI, and that she would not be required to perform ministerial, clerical duties. Mr. Lulves specifically stated and represented that she would have plenty of support staff. The specific representations and promises from Mr. Nelson, Mr. Lulves and Mr. Masloff, on behalf of ISI, were material and significant factors in Ms. O'Donnell's decision to accept employment with ISI.

4

11.    During the course of the negotiations between Ms. O'Donnell and ISI, numerous proposed job descriptions were discussed, as the parties attempted to define the scope of the duties and responsibilities of this new position. ISI initially proposed that the position would be given the title "Director of Communications," but agreed to change this to "Director of Communications and Public Affairs" at Ms. O'Donnell's suggestion. ISI represented to Ms. O'Donnell that she would have sufficient clerical and support staff to assist her. ISI explicitly promised Ms. O'Donnell that she would not have to perform clerical duties for ISI.

12.    During negotiations regarding salary for this position, ISI initially proposed a range of $40,000 to $50,000. Ms. O'Donnell stated that this was too low for the position, as she had previously been considered for positions in the range of $85,000. ISI raised its proposal to $65,000, in light of its promises and representations that she would have the flexibility to pursue her education and independent business opportunities. The promises and representations made by Mr. Nelson, Mr. Lulves and Mr. Masloff, on behalf of ISI, were significant and material factors in convincing her to reject other opportunities and accept employment with ISI; were a material part of the terms and conditions of her employment; and were relied upon by Ms. O'Donnell. Ms. O'Donnell started as an employee of ISI on March 12, 2003.

13.    Shortly after starting her employment with ISI, Ms. O'Donnell learned and realized that the promises and representations regarding her terms and conditions of employment were not being met. She was never provided with the clerical or support staff promised; she was not given time to participate in many of the independent activities she had previously

performed, including appearing on major television programs that could have provided ISI with substantial media coverage and publicity; and, although she was provided with minimal time to attend courses towards her Master's Degree, she ultimately had to withdraw from that program due to the workload she was given at ISI. These actions, or lack of action, on the part of ISI directly conflict with the promises and representations made to Ms. O'Donnell during the negotiations of the terms and conditions of her employment with ISI, and upon which she relied in accepting ISI's offer of employment.

14. During Ms. O'Donnell's employment with ISI, ISI failed or refused to meet or keep its representations, statements and promises to Ms. O'Donnell regarding the terms and conditions of her employment by failing or refusing to provide her a staff of employees and/or support staff; by failing or refusing to provide adequate time to attend classes at Princeton University; by failing or refusing to permit and allow her to appear on national television news programs; and by failing or refusing to allow her to continue to pursue other activities and maintain relationships with and do work for other clients and interests.

15. Ms. O'Donnell, without the assistance of sufficient staff or support, successfully planned and implemented ISI's 50th Anniversary Gala ("Gala"), an event attended by 1,100 donors, supporters, friends and employees of ISI along with business and political leaders and the news media. While Ms. O'Donnell had been directed to plan and implement the Gala by working with all or many of ISI's employees and had been promised full support of ISI's entire staff, many of those employees, specifically many male employees, refused to take or follow any directions from O'Donnell and openly defied her requests,

directions and orders related to the Gala event. Nevertheless, following the Gala and at meetings of ISI's employees, Mr. Cribb, ISI's President, read aloud letters from prominent business and political leaders praising the high quality and success of the Gala.

16. During the entire period of her employment with ISI, Ms. O'Donnell was never advised by ISI that her work was unsatisfactory or unacceptable. ISI periodically advised Ms. O'Donnell during her employment that she was doing a good or excellent job; that ISI appreciated the high quality of her work; and that ISI wanted her to remain employed with ISI. Ms. O'Donnell never received any oral or written warning or notice or any other disciplinary action from ISI regarding her performance and was never advised that she needed to improve any part of her work or that her continued employment with ISI was in any jeopardy. ISI never gave Ms. O'Donnell a formal performance review or evaluation.

17. At a meeting with Mr. Nelson in November 2003, Ms. O'Donnell discussed a job offer she had received from ICON Productions, concerning publicity work for the Mel Gibson movie *The Passion of the Christ* (hereinafter "*The Passion*"), and in that meeting Mr. Nelson advised her that she was doing a great job for ISI; that she was needed by or at ISI; and that ISI wanted her to remain employed for ISI. In that same meeting Mr. Nelson encouraged Ms. O'Donnell not to leave her employment for ISI and reasoned with her that it would be a mistake for her to leave ISI and work for ICON Productions for only six months instead of keeping her "permanent" job with ISI. Ms. O'Donnell relied upon Mr. Nelson's representations regarding her job performance and the "permanent" nature of her employment with ISI and declined to accept the position with ICON Productions.

7

18.     Ms. O'Donnell notified and discussed with ISI that she was working on and doing things and participating in activities in connection with *The Passion*, and ISI specifically and expressly approved such work and activities by Ms. O'Donnell while she was an employee of ISI and while she was "on ISI's time;" and such work and activities by Ms. O'Donnell were approved by ISI and permitted as a condition of her employment for ISI; and such work and activities were part of the matters discussed with ISI during the negotiation of the terms and conditions of her employment. In addition, ISI knowingly and willingly paid for Ms. O'Donnell's trip to a screening of *The Passion* since she would meet journalists at the screening and since this activity would be and turned out to be of direct benefit to ISI.

19.     At a meeting with Mr. Nelson on or about January 28, 2004, Mr. Nelson stated or confirmed to Ms. O'Donnell that ISI was very happy with her work.

20.     During the first part of 2004, Ms. O'Donnell advised ISI that she intended to pursue an opportunity to go to the country of Jordan on March 1, 2004 on an activity which would have and produce both benefits and rewards to Ms. O'Donnell personally and ISI professionally, and Ms. O'Donnell requested time off from work to pursue that opportunity. Mr. Schneider and Mr. Nelson responded to Ms. O'Donnell in a written Memorandum dated February 25, 2004 ("Memorandum") that ISI:

> "remain[s] committed to letting you represent [ISI] (once the business advantage [of the trip] is satisfactorily demonstrated) at a time when it is mutually beneficial if you choose that option. This note confirms our willingness to grant your request to take the early March date as personal vacation."

8

21.    The statements in the Memorandum reveal that ISI, as of February 25, 2004, anticipated that Ms. O'Donnell would be an employee of ISI in "early March" since ISI was granting her request to take vacation starting on March 1, 2004.

22.    While Ms. O'Donnell was an employee of ISI, it had no policy against the use of its email and computer systems by employees and there were no restrictions or prohibitions on such use other than ISI could open and read an employee's e-mail and employees should use their reasonable judgment in such use.  ISI permitted and allowed other employees and specifically male employees to use ISI's e-mail and computer systems for activities not related to ISI and/or to their work or duties for ISI, and such use was done with impunity and without any punishment or retribution.  Ms. O'Donnell did not abuse or misuse ISI's e-mail or computer systems in any way while employed by ISI, yet ISI has subsequently sought to use "personal use of its electronic mail system" as a basis for her termination.

23.    ISI, through its personnel and employees and through its work and publications, in meetings, lectures, published articles and other such activities and events, openly advocated beliefs and philosophies to the effect that a female employee requires the supervision, authority, headship or "covering" of a male employee.  ISI made personnel decisions including without limitation promotions, placements, demotions, discipline and termination and organizational and structural decisions and changes in conformity with its beliefs and philosophies that a female employee requires the supervision, authority, headship or "covering" of a male employee.

24.    On one occasion during her employment, a co-corker, Mr. Cain, in connection with Ms. O'Donnell's efforts and work on the Gala, ordered or stated to Ms. O'Donnell to "strap it on," which was a crude and demeaning reference to an artificial male sexual organ used by some females in order to act like a male in sexual acts.  Ms. O'Donnell was highly offended and upset at Mr. Cain's remark and specifically and officially notified and reported to Mr. Nelson that the remark had been made by Mr. Cain.  Mr. Nelson advised and promised Ms. O'Donnell that he would speak to Mr. Cain about the remark and correct the problem created by Mr. Cain's making the remark, but to Ms. O'Donnell's knowledge, Mr. Nelson did not carry through on that promise and did not speak to Mr. Cain about the remark or take any corrective action in regard to the remark or Mr. Cain's making the remark.  To Ms. O'Donnell's knowledge and belief, Mr. Cain was never disciplined or reprimanded for making this offensive statement.

25.    Also during Ms. O'Donnell's employment with ISI, and upon information and belief, Mr. Masloff expressed dissatisfaction and concern that ISI would be harmed in its fund raising efforts if ISI's donors knew or noticed that Ms. O'Donnell was heading a department without being under the covering or supervision of a male employee.  Mr. Masloff was also know to have belittled Ms. O'Donnell's work to his staff during department meetings when she was not present.

26.    Many male employees of ISI, including supervisors and executives, openly refused to take directions from Ms. O'Donnell since she is a female; resisted her leadership since she is a female; and openly made hostile comments to her since she is a female.  ISI permitted this hostile environment to exist and took no action to correct, remedy or

alleviate the same.

27.    To Ms. O'Donnell's knowledge and belief, ISI did not post and/or maintain in any

conspicuous place where notices to employees and applicants for employment are

customarily posted any notice required by law explaining an employee's rights under

Title VII of the Civil Rights Act.

28.    Based on information and belief, a former male employee or associate of ISI, who

allegedly was terminated by ISI for his involvement in an incident or incidents of sexual

harassment, was not terminated until legal action was threatened and was given a

generous severance package upon termination.

29.    In late January 2005 Ms. O'Donnell was advised by ISI that there was or would be a

reorganization within ISI's structure and that Mr. Nelson, Ms. O'Donnell's supervisor,

was taking a sabbatical.  The result of this reorganization was that Ms. O'Donnell was

assigned to report to and be under the direct supervision of Mr. Schneider, a Director

level employee but junior to her on the hierarchy chart provided at the time she was hired.

At the time of the reorganization Mr. Schneider, a male employee who had been hired by

ISI directly out of college as a receptionist and clerical assistant, had little or no

experience in communications and public affairs, and had in fact been trained by Ms.

O'Donnell since he was inexperienced in public relations and marketing.  Mr. Schneider,

at the time he was made Ms. O'Donnell's supervisor, did not have the experience

required by ISI to fill that position, and did not satisfy the requirements of the job

description provided to Ms. O'Donnell at the time she was hired.

11

30.    ISI's directive to Ms. O'Donnell to report to Mr. Schneider and to transfer responsibility
       for all ISI's public relations activities to Mr. Schneider amounted to a demotion of Ms.
       O'Donnell.  Prior to being directed to report to Mr. Schneider, who was made a Director,
       Ms. O'Donnell had reported directly to a Vice President.  ISI wanted every female
       employee to report to a male employee, which was in line with its philosophy that a
       female employee should not have any authority without being under the headship, or
       authority, of a male employee.

31.    As a result of ISI's reorganization, Ms. O'Donnell was the only Director level employee
       working under Mr. Nelson who was demoted and directed to report to an employee of a
       lower level.

32.    In a meeting with Mr. Nelson on or about February 11, 2004, Ms. O'Donnell, in response
       to her inquiries about her demotion and the circumstances surrounding it, was advised by
       Mr. Nelson that "[Mr. Schneider's] an inside guy, you're an outside girl" and that Ms.
       O'Donnell was being made to report to Mr. Schneider because Mr. Nelson needed a
       "proxy" to supervise Ms. O'Donnell while he was absent on sabbatical.  There were no
       reasonable business reasons for Ms. O'Donnell's demotion.

33.    On or about February 12, 2004, as a direct result of the reorganization, her demotion and
       the manner in which she had been treated and discriminated against by ISI, Ms.
       O'Donnell contacted the EEOC and inquired about her rights and ISI's obligations since
       Ms. O'Donnell believed she was the target and/or had been the subject of unlawful
       discrimination.  The EEOC advised Ms. O'Donnell to request from ISI a new, revised
       description for her job or position as a result of the organization.  Between February 12th

and February 19th, Ms. O'Donnell made several requests to Mr. Schneider and Mr. Nelson for a new, revised description for her job or position as a result of the re-organization, but the requested job or position description was never provided.

34.   After Ms. O'Donnell became Mr. Schneider's subordinate, Ms. O'Donnell was ordered to perform clerical, secretarial and administrative duties for Mr. Schneider in direct contravention and violation of the representations, statements and promises made to her when she was negotiating her position with ISI and prior to her accepting ISI's offer of employment, and the terms and conditions of her employment.

35.   Ms. O'Donnell advised Mr. Schneider, prior to the February 25 memo identified above, that she had contacted the EEOC about her rights in regard to the reorganization and her demotion.  Ms. O'Donnell prepared and delivered a letter dated February 20, 2004 to Mr. Lulves and Mr. Nelson explaining and complaining of ISI's disparate treatment of Ms. O'Donnell; raising her concern that ISI's actions constituted gender discrimination; noting that the representations, statements and promises made by ISI when Ms. O'Donnell had been employed by ISI had not been honored; and asking for ISI's clarifications and explanations and a meeting to discuss these matters.  ISI did not respond to Ms. O'Donnell's letter.

36.   In the Memorandum of February 25th referred to above, the authors thanked Ms. O'Donnell for "telling [Mr. Schneider] about your recent conversations with the EEOC" but interpreted those conversations to be about "labor regulations concerning vacation time."  After receiving the Memorandum, Ms. O'Donnell sent Mr. Schneider an email on February 25, 2004 correcting his interpretation of her contact with the EEOC and

explaining that "[Ms. O'Donnell's] recent conversation with EEOC was not about vacation, but about [Ms. O'Donnell's] recent demotion and the grounds for my demotion."

37.    ISI terminated Ms. O'Donnell on February 26, 2004 and offered no reason or justification for the termination other than a vague reference to the professional relationship not working out.

38.    The true reason behind and motive for ISI's termination of Ms. O'Donnell was retaliation for her complaining to and contacting the EEOC about her demotion and the unlawful discrimination and disparate treatment Ms. O'Donnell was suffering and receiving from ISI.  ISI had and demonstrated a bias against female employees and such bias was a motivating if not the real reason for ISI's discrimination and unequal treatment of Ms. O'Donnell and for her demotion and termination by ISI.

39.    Following her termination by ISI, the following quote appeared in the "Community Profile" of a weekly supplement section of the *News Journal*, published on April 14, 2004, regarding Ms. O'Donnell and her recent termination by ISI: "'She [Ms. O'Donnell] was terminated for operating a for-profit business [using ISI's time and resources],' Elaine Pinder, spokeswoman, said last Thursday." ("Quote").  Ms. Pinder made and offered the Quote as an official representative and agent of ISI.  The Quote was false and misleading.  The Quote was the first time ISI advanced or set forth any reason why Ms. O'Donnell had been terminated (other than the vague reference to the "relationship not working out" as set forth when she was fired on February 26, 2004).  The Quote by ISI's employee and agent Ms. Pinder indicates or implies that Ms. O'Donnell was doing

something wrong, or was improperly using, or even worse stealing, ISI's assets, while
employed by ISI.

40.    ISI never raised with Ms. O'Donnell the pretextual reason [that Ms. O'Donnell was
operating a for-profit business using ISI's time and resources as stated in the Quote] for
her termination prior to the Quote in the *News Journal* newspaper on April 4, 2004.
Upon information and belief, male employees operated a for-profit business on ISI time,
using ISI resources, and with the full knowledge of ISI management, yet these male
employees were never disciplined nor terminated as a result of this activity.

41.    The Quote cast, and continues to cast, aspersions on Ms. O'Donnell's character and
reputation; hindered and continues to hinder her career and professional opportunities;
caused and continues to cause potential clients and employers to stop calling and
contacting her; caused and continues to cause her to lose income; and tainted and
continues to taint her with shame, scandal or wrongdoing.

42.    ISI knew or should have known that the Quote would be published in the *News Journal*
and would be widely disseminated and read by the public at large.  ISI knew or should
have known that the Quote would seriously, materially and negatively affect, and would
continue to affect, Ms. O'Donnell's reputation and credibility and ability to earn a living
as a public relations expert and media "pundit" or expert.  ISI knew or should have
known that Ms. O'Donnell's fellow journalists and those persons working in the news
media field would read the Quote, or would be the most likely group to read the Quote.
ISI knew or should have known that the Quote and the false statements therein regarding
ISI's termination of Ms. O'Donnell would directly and severely harm and damage, and

continue to harm and damage, Ms. O'Donnell's reputation with fellow journalists and the news media, and that those persons were and are the persons most likely to affect Ms. O'Donnell's career and her ability to gain future employment and income.

## COUNT I
## GENDER DISCRIMINATION UNDER FEDERAL LAW

43.   Ms. O'Donnell hereby incorporates the allegations raised in paragraphs 1 through 42, as if set forth herein in full.

44.   ISI allowed and permitted a work environment to exist that was hostile and demeaning to its female employees, as evidenced by the treatment of Ms. O'Donnell during her period of employment.

45.   ISI failed or refused to provide Ms. O'Donnell with the staff, resources and support to perform her position, but provided those same resources to male employees.

46.   ISI failed or refused to allow Ms. O'Donnell to perform her duties without the direct supervision of a male employee during the period when her immediate supervisor, Mr. Nelson, was to be away on a sabbatical.  Male employees were not treated in this manner.

47.   Ms. O'Donnell was demoted, and placed under the direct supervision of a less qualified male employee with little experience in communications or public relations.  Male employees were not treated in this manner.

48.   At the time of her demotion, Mr. Schneider was a Director level employee, as was Ms. O'Donnell, while her previous supervisor was a Vice President.  No other male Directors were placed under the direct supervision of fellow Directors, and all other male Directors reported to executives at the Vice President level or higher.

16

49.    The actions described herein were taken solely because Ms. O'Donnell was a female employee.

50.    The actions described herein are in violation of Title VII of the Civil Rights Act of 1964, as amended, which prohibits disparate treatment of employees based upon their gender.

## COUNT II
## GENDER DISCRIMINATION UNDER STATE LAW

51.    Ms. O'Donnell hereby incorporates the allegations raised in paragraphs 1 through 50, as if set forth herein in full.

52.    Delaware's Discrimination in Employment Act mirrors the prohibitions set forth in the companion federal statute.

53.    The actions described herein are in violation of Delaware's Discrimination in Employment Act.

## COUNT III
## RETALIATION UNDER FEDERAL LAW

54.    Ms. O'Donnell hereby incorporates the allegations raised in paragraphs 1 through 53, as if set forth herein in full.

55.    In February 2004, Ms. O'Donnell contacted the EEOC for the purpose of ascertaining her rights under the law to be free from discrimination by ISI based upon her gender.

56.    Prior to February 2004, Ms. O'Donnell had complained to her supervisors about the disparity between male and female employees of ISI.

57.    Prior to her termination, Ms. O'Donnell made her supervisors, including Mr. Schneider, Mr. Nelson, and Mr. Lulves, aware that she had spoken to the EEOC about her concerns and complaints.

58.     In a Memorandum dated February 25, 2004, ISI acknowledged that it was aware that Ms.
        O'Donnell had contacted the EEOC.  In this same Memorandum, ISI granted her request
        for leave or vacation for the period March 1 through March 12, 2004, but mistakenly
        referenced her EEOC contact as having to do with vacation policy issues.  Ms. O'Donnell
        received this Memorandum at approximately 4:37 p.m. on February 25.

59.     At the time of the February 25th Memorandum, ISI indicated that it considered Ms.
        O'Donnell to be an ISI employee, and gave no indication that her position was in
        jeopardy, or that her work performance was in any way substandard.

60.     At 4:56 p.m. on February 25, Ms. O'Donnell clarified in an e-mail to Mr. Schneider that
        her contact with the EEOC involved her "recent demotion and the grounds for [her]
        demotion."

61.     At approximately 5:20 p.m. on February 25 Ms. O'Donnell received a telephone call from
        Mr. Nelson's assistant, Ms. Duke, that she was to report to Mr. Nelson's office at 9:30
        a.m. the following morning.

62.     Ms. O'Donnell reported to Mr. Nelson's office at the appointed time and was notified that
        she was being terminated.  This meeting was attended by Mr. Nelson and Ms. Pinder.
        The only reason for the termination provided during this meeting was a vague statement
        that "the professional relationship was not working out."  No mention was made at that
        time of prohibited use of company e-mail, the operation of any side-line business while
        on ISI time, the theft of time or services or resources from ISI, or any of the various bases
        for Ms. O'Donnell's termination raised by ISI subsequently.

18

63.    Ms. O'Donnell was terminated solely because she had contacted the EEOC to complain

about the perceived discriminatory treatment she received from ISI, and immediately after

she informed her supervisor that her contact with the EEOC was for this purpose.

64.    Ms. O'Donnell, prior to the meeting with Mr. Nelson on February 26th, had received no

prior warnings about her job performance, about any unauthorized use of ISI's e-mail

system or other resources, or that her job was in jeopardy.  In early February, Mr. Nelson

had specifically stated that ISI was "happy" with her performance and wanted her to be

happy with ISI.

65.    Ms. O'Donnell was terminated in retaliation for her communications with the EEOC, and

for complaining to her supervisors about the perceived discriminatory treatment she

received at ISI, which constitutes a violation of Title VII's prohibitions against retaliation.

## COUNT IV
## RETALIATION UNDER STATE LAW

66.    Ms. O'Donnell hereby incorporates the allegations raised in paragraphs 1 through 65, as

if set forth herein in full.

67.    Delaware's Discrimination in Employment Act mirrors the prohibitions against

retaliation set forth in the companion federal statute.

68.    The actions described herein are in violation of Delaware's Discrimination in

Employment Act.

## COUNT V
## DEFAMATION

69.    Ms. O'Donnell hereby incorporates the allegations raised in paragraphs 1 through 68, as

if set forth herein in full.

70.    Subsequent to her termination, ISI, through its employee or agent, caused to be published in a newspaper supplement of general circulation in Delaware and the surrounding community, a statement to the effect that Ms. O'Donnell was terminated "for operating a for-profit business [using ISI's time and resources]."  This article was also circulated on the internet, on the *New's Journal's* official web site.

71.    This statement was made falsely, and/or with a reckless disregard for the truth or accuracy of the statement.

72.    ISI was aware, at the time the statement was made, that it was false and misleading.

73.    ISI was aware, at the time the statement was made, that it would be published to third parties, including those persons with whom Ms. O'Donnell maintained personal and professional relationships, and from whom Ms. O'Donnell did or could receive business or employment opportunities.

74.    ISI was aware, at the time the statement was made, that it was likely to cause injury to Ms. O'Donnell's personal and professional reputation; that it was likely to diminish the esteem, respect, goodwill or confidence in which she was held; that it was likely to cause bad feelings or opinions about her; that it was likely to lower or injure her in the estimation of the community at large, and the community within which she practices her profession; and/or that it was likely to deter third parties from associating with or dealing with her both personally or professionally.

75.    ISI was aware, at the time the statement was made, that it was likely to defame her in her trade, business or profession.

76.   The statement made by ISI has caused damage to Ms. O'Donnell's personal and professional reputation, has diminished her earning capacity, has reduced or eliminated many of the business opportunities she had previously enjoyed, and has otherwise caused significant personal and professional damage.

**COUNT VI**
**FRAUDULENT INDUCEMENT**

77.   Ms. O'Donnell hereby incorporates the allegations raised in paragraphs 1 through 76, as if set forth herein in full.

78.   At the time ISI entered into negotiations with Ms. O'Donnell regarding her employment with ISI, it made certain promises and representations to her regarding the terms and conditions of her employment, including that she would be given sufficient time to pursue a Master's Degree at Princeton University; that she would have sufficient clerical and support staff; and that she would be allowed time and the opportunity to pursue non-ISI, for-profit business opportunities.

79.   Ms. O'Donnell declined other offers of employment and business opportunities, and accepted employment at ISI for a salary far reduced from what she had originally requested, in reliance upon the promises and representations made by ISI.

80.   Ms. O'Donnell further agreed to re-locate to the Wilmington, Delaware area, and incurred substantial financial obligations including the purchase of a house and accompanying mortgage obligation, in reliance upon the promises and representations made by ISI.

81.    During her employment with ISI, Ms. O'Donnell turned down several business and employment opportunities after discussing the same with ISI, in reliance upon ISI's statement and representations that she had "permanent" employment with ISI, and that ISI was pleased with her performance.

82.    ISI's promises and representations regarding the terms and conditions of her employment proved to be false, as she was not provided with sufficient clerical and support staff, she was not provided with the opportunity to pursue a Master's Degree, and she was not allowed time to pursue outside business opportunities.  In fact, the latter has been offered by ISI as a reason for her termination.

83.    ISI made the promises and representations set forth herein knowing that they were false and to induce Ms. O'Donnell to accept employment with ISI, to re-locate to the Wilmington, Delaware area, and to continue her employment with ISI and turn down other offers of employment and business opportunities.

84.    Ms. O'Donnell has suffered damages as a result of ISI's fraudulent inducement, as set forth herein, in the form of the cost of the acquisition of her home and corresponding mortgage, lost business opportunities and the profits therefrom, and lost income from the employment offers and business opportunities she turned down as a result of ISI's promises and representations.

## COUNT VII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

85.    Ms. O'Donnell hereby incorporates the allegations raised in paragraphs 1 through 84, as if set forth herein in full.

22

86.   The actions taken by ISI, and the statements made about and concerning her, which were done through its duly authorized officers, directors, employees, representatives and agents, were extreme and outrageous, were taken with the intent to cause extreme emotional harm and damage to Ms. O'Donnell, and to intimidate her so that she would not pursue her legal rights under applicable employment law statutes.

87.   Ms. O'Donnell has suffered extreme emotional harm as a result of the actions taken or not taken by ISI, and statements made by and on behalf of ISI, in the form of grief, shame, humiliation, embarrassment, anger, chagrin, disappointment and worry.  This harm has caused physical manifestations, and caused Ms. O'Donnell to seek treatment for her distress.

88.   ISI is liable for the actions taken or not taken, and for the statements made, by its officers, directors, employees, representatives and agents that caused the emotional distress suffered by Ms. O'Donnell.

<u>COUNT VIII</u>
<u>BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING</u>

89.   Ms. O'Donnell hereby incorporates the allegations raised in paragraphs 1 through 88, as if set forth herein in full.

90.   Delaware recognizes that an employer has a duty to act in good faith and with fair dealing to its employees.  *Pressmen v. E.I. DuPont de Nemours & Co.*, Del.Supr., 679 A.2d 436 (1996).

91.   Ms. O'Donnell's termination was in part a result of the ill will harbored by ISI towards female employees, particularly those in positions of responsibility or authority.

23

Case 1:05-cv-00457-JJF     Document 8     Filed 09/29/2005     Page 24 of 27

92. Ms. O'Donnell's termination was intended to cause her harm, both personally and professionally, and to cause harm to her emotional state and well-being.

93. Ms. O'Donnell's employment, and her resulting termination, involved substantial incidents of fraud, deceit, and/or misrepresentation.

94. ISI is liable for the damages caused to Ms. O'Donnell by its breach of the implied covenant of good faith and fair dealing.

## COUNT IX
## TORTIOUS INTERFERENCE WITH CONTRACT

95. Ms. O'Donnell hereby incorporates the allegations raised in paragraphs 1 through 94, as if set forth herein in full.

96. ISI's promises and representations regarding the terms and conditions of Ms. O'Donnell's employment intentionally and improperly induced her not to enter into other employment or business opportunities at the time she was hired.

97. ISI's promises and representations regarding her performance and prospects while employed by ISI intentionally and improperly induced her not to enter into other employment or business opportunities while she was employed by ISI. Such employment and business opportunities included employment in lieu of her position with ISI, as well as opportunities that she could have performed in conjunction with and at the same time she remained employed by ISI.

98. ISI's actions and statements at the time of her termination and subsequent to her termination intentionally and improperly caused third parties to refrain from conducting business with or engaging Ms. O'Donnell in employment.

24

99.   ISI is liable to Ms. O'Donnell for damages caused by its intentional interference with her prospective business and employment opportunities, including those that existed prior to her employment with ISI, those that existed during her employment with ISI, and those that existed subsequent to her employment with ISI.

## COUNT X
## BREACH OF EMPLOYMENT CONTRACT

100.  Ms. O'Donnell hereby incorporates the allegations raised in paragraphs 1 through 99, as if set forth herein in full.

101.  During her employment with ISI, Ms. O'Donnell's supervisor, Mr. Nelson, an ISI Vice President, represented to her that she had "permanent" employment with ISI. This statement was made at the time she was contemplating accepting a full-time position doing public relations for *The Passion*, and as a direct result of her discussions about this opportunity with Mr. Nelson.

102.  In the February 25, 2004 Memorandum, ISI granted Ms. O'Donnell vacation for a business trip to Jordan, and represented that the vacation was to last from March 1 to March 12, 2004. No mention was made in this Memorandum that her employment status was in jeopardy.

103.  Ms. O'Donnell was never warned or put on notice that her performance was in any way substandard, and she never received any form of disciplinary action from ISI.

104.  Ms. O'Donnell was terminated on February 26, 2005, at approximately 9:30 a.m., less than 24 hours after her receipt of the Memorandum from ISI granting her vacation from March 1 to March 12, 2004.

105.   ISI, by the statements and representations made by Mr. Nelson, and the February 25, 2004 Memorandum, made an express or implied promise of continued permanent employment to Ms. O'Donnell.

106.   Ms. O'Donnell accepted ISI's offer of continued and permanent employment by turning down several prospective employment and business opportunities while she was employed by ISI, including the employment opportunity she was offered and discussed with Mr. Nelson at the time of his statement and representation referenced above.

107.   ISI's actions, and Ms. O'Donnell's reliance thereon, constitute a contract of employment that was not subject to the employment at will doctrine.

108.   ISI is liable to Ms. O'Donnell for breach of her employment contract with ISI.

WHEREFORE, Plaintiff Christine O'Donnell demands judgment against Defendant Intercollegiate Studies Institute, Inc., on all counts of this Amended Complaint, in an amount to be proven or otherwise ascertained at trial before jury, and specifically demands judgment for the following:

a)   Compensatory damages;

b)   Punitive damages;

c)   Back pay;

d)   Front pay;

e)   Compensatory and punitive damages caused by emotional distress;

f)   Damages caused by ISI's breach of contract and breach of the implied covenant of good faith and fair dealing;

g)      Compensatory and punitive damages as provided by the federal and state statutes

specified herein;

h)      Compensatory and punitive damages caused by ISI's defamatory statements;

i)      Compensatory and punitive damages caused by ISI's tortious interference with

contract;

j)      Compensatory and punitive damages caused by ISI's fraudulent inducement;

k)      All costs and expenses of this action, including court costs, reasonable attorney's

fees, expert fees, and other costs and expenses as appropriate; and

l)      Such further relief as the Court deems is just and equitable.


TIGHE, COTTRELL & LOGAN, P.A.


By:      /s/ G. Kevin Fasic
         G. Kevin Fasic, Esquire (DE #3496)
         First Federal Plaza, Suite 500
         P.O. Box 1031
         Wilmington, DE 19899
         (302) 658-6400 - Telephone
         (302) 658-9836 - Facsimile
         k.fasic@lawtcl.com - Electronic Mail
         Attorney for Plaintiff
         Christine O'Donnell

Dated: September 29, 2005